## GOINS et al. v. MERRYMAN et al.
No. 27335. Jan. 11, 1938.
Rehearing Denied May 10, 1938.
Application for Leave to File Second Petition for Rehearing Denied June 21, 1938.

Varner & Varner, for plaintiff in error Frank Goins.

Edwin T. Watkins, for plaintiffs in error B. G. Perrymore and T. F. Perrymore.

A. E. White, for plaintiffs in error Robert H. Russell, Laura B. McClain, Mrs. D. S. Ainsworth, J. T. McClain, Mrs. Lon Evans, Mrs. Albert Tobler, Mrs. J. H Tibbitts, Mrs. H. A. Brady, and John Q. McClain.

James L. Hole, for defendants in error Ellen Merryman, J. S. Bailey Merryman, and James Henry Merryman.

Babb & Babb, for defendants in error Grace Babcock and Sallie E. Shockley.

HURST, J. This action involves the ownership and right to possession of approximately 500 acres of land along the Arkansas river where it forms the boundary between Le Flore county on the south and Sequoyah county on the north. At the point in controversy, the river, in its flow generally from west to east, turned south for about a section and then east for about another section and back north, thereby making an oxbow or U bend to the south. The land to the north of the river within the U bend was in Sequoyah county and was originally allotted to Cherokee Indians and freedmen. The river formed the southern boundary of these allotments. The land to the south was in Le Flore county and was originally allotted to Choctaw Indians. The river was the northern boundary of their allotments.

By 1927 the river had changed its course, migrating to the north and east so as to practically eliminate the lower part of the U bend.

Plaintiff, Ellen Merryman, who owned a tract of land lying to the west and on the outside of the bend in Le Flore county, brought this action to recover possession of all that land left by the receding of the river on the theory of accretion. She joined as defendants the two owners of the land within the U bend in Sequoyah county, and also other owners of property along the outside of the U bend in Le Flore county. The defendants J. S. Bailey Merryman and James Henry Merryman jointly owned the tract adjoining the land of plaintiff to the north on the outside of the U bend. The defendants Sallie E. Shockley, Grace Babcock, Robert H. Russell, Laura McClain, and those persons referred to as the McClain heirs were the owners of property around the south and up to the east side on the outside of the U bend. The defendant Goins was the owner of a tract of land within the U bend, which land was originally opposite the property of plaintiff across the river to the northeast, but which, by 1927, had been completely passed over by the river and was located on the southwest side. The defendants T. F. Perrymore and B. G. Perrymore were the owners of other property within the U bend, and by 1927 the south bank of the river ran diagonally across their property toward the south and east, where it joined the old river bed near the southeast part of the U bend. The river had thus passed over more than half of the Perrymore land.

In 1927 the river made a sudden change cutting across the top of the U bend, but for the purposes of this opinion this change is immaterial.

The land of defendant Shockley is located on the southwest bend outside of the U, and originally a small stream known as Cache creek flowed through her property and entered the river at approximately the northeast corner of her property. The general direction of the flow of this creek was to the east. Because of the recession of the river, the mouth of Cache creek moved to the east, the creek running almost due east across the north end of Shockley's property and entering the old river bed and flowing along it until it joined the Arkansas river at the southeast corner of the U bend. Thus this creek running to the

north of the property of the defendants Shockley, Babcock, Russell, Laura McClain, and the McClain heirs separated their property from that within the U bend.

Plaintiff claimed the land in question on the theory that the river had receded gradually and imperceptibly, forming the land in controversy by accretion to her property. All of the defendants except Goins and the Perrymores made the same contention; the only dispute between them was whether this alleged accretion to the property of those defendants on the south side of the U bend was cut off and terminated by Cache creek, or whether it extended on past the creek to the south bank of the Arkansas river as it was in 1927. On the other hand the defendants Goins and Perrymores claimed that the change in the course of the river was not by the process of accretion, but was a sudden change by the process of avulsion. The trial court found that the land from the south side of the old river bed to the south bank of the river as it was located in 1927 was formed by the process of accretion rather than avulsion. The trial court further found that the accretion to the owners south of the U terminated at Cache creek and did not extend beyond. Judgment was then rendered giving plaintiff possession of all the property lying east of her original property up to the bank of the river as it was in 1927. The court gave the defendants J. S. Bailey Merryman and James Henry Merryman all land lying east of their property up to this river bank. The court gave to defendant Shockley the small strip of land between Cache creek and the southern boundary of that land given to the plaintiff. The court gave to the defendants Babcock, Russell, McClain heirs, and Laura McClain only the accretion south and east of Cache creek.

The defendants Goins and Perrymores have appealed to this court and raised the first question for our determination: Was the land involved in this action formed by accretion or avulsion? The law regarding this question is clearly established and prescribed in this state by statutes, which are declaratory of the common law. Section 11731, O. S. 1931, provides:

"Where from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the land."

Section 11732, O. S. 1931, provides:

"If a river or stream carries away, by sudden violence, a considerable and distinguishable part of a bank, and bears it to the opposite bank, or to another part of the same bank, the owner of the part carried away may reclaim it within a year after the owner of the land to which it has been united takes possession thereof."

The former section defines what is commonly known as accretion, and the latter section defines what is commonly known as avulsion. It is also clearly established that the test for determining if the change in the river is gradual and imperceptible is that "though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on." 9 C. J. 195; County of St. Clair v. Lovington, 23 Wall 46 23 L. Ed. 59; Jefferis v. Land Co., 134 U. S. 178, 10 S. Ct. 518, 33 L. Ed. 872; State of Nebraska v. State of Iowa, 143 U. S. 359, 12 S. Ct. 396, 36 L. Ed. 186. Thus, in order to constitute accretion it is not necessary that the change be imperceptible between two distinct points of time. Yutterman v. Grier (1914, Ark.) 166 S. W. 749.

It has been held that in order to constitute avulsion there must be a detachment of earth from one side of the river and a deposit of the same earth on the other side of the river in such a manner that it can be identified as the land of the other owner. State of Nebraska v. State of Iowa, supra; McCormack v. Miller (Mo.) 144 S. W 101; Yutterman v. Grier, supra. But, contrary to these holdings, the statute regarding avulsion in this state has been relaxed by judicial construction in the case of Willett v. Miller (1936) 176 Okla. 278, 55 P.2d 90. The rule is stated as follows:

"Where a nonnavigable stream is the boundary line between riparian owners, and by a sudden freshet or flood a considerable area of land belonging to one owner is washed away by the current of the river and at the same time land is formed on the opposite bank of the stream in approximately the same area, the doctrine of avulsion applies, and there is no change in the boundary line. It remains at the place where the middle of the main channel of the stream was before the freshet or flood."

Although it is noted the statute provides that if the river carries away, by sudden violence, "a considerable and distinguishable part of a bank, and bears it to the opposite bank," thus indicating that it must be capable of being identified, yet in Willett v. Miller, supra, the court said:

"Cases are cited which seem to hold that before the doctrine of avulsion may be applied in a case where land of one riparian

proprietor is, suddenly, by flood water, washed away, and at the same time by the same means land is formed along the opposite bank and adjacent to the land of the riparian proprietor on that side of the stream, the owner of the land washed away must be able to follow and identify his soil as the identical soil washed away from his premises, and if he is not able so to do, he must lose. Such is not the true rule. The true rule is that if the change is so sudden that the owner of the land washed away is able to point out·approximately as much land added to the opposite bank as he had washed away, the doctrine of avulsion applies, and there is no change in the boundary line."

In the instant case the trial court found that the Arkansas river was navigable at the point of the location of these lands. It is immaterial, however, whether the river or stream is navigable or nonnavigable, as the same principles apply to each. State of Nebraska v. State of Iowa, supra.

Our problem, therefore, is the application of these principles to the facts in the instant case. In this connection we must keep in mind that this is an action at law and the judgment of the trial court will not be reversed if there is any competent evidence reasonably tending to support it. Fulford v. Fulford (1930) 147 Okla. 47, 294 P. 183. The evidence, on the whole, shows that during the 30 years within which the change took place the river would regularly rise, the land be flooded for a few days, during which time the north and east bank would cave away, and as the water subsided the course of the river would have moved slightly in that direction. Also by such process the evidence shows that land was deposited on the south and west sides of the river in approximately the same quantity, so that the width of the river bed was substantially the same. We find no testimony to the effect that any person saw the banks cave away or perceived the changing process while in progress. On the other hand, a great number of witnesses testified that the change in the course of the river was gradual. Upon a careful examination of the entire record, we think that there is some competent evidence reasonably tending to support the judgment of the trial court on this question.

The defendants Goins and Perrymores contend, however, that this case is indistinguishable from Willett v. Miller, supra, wherein the court found that the change in the course of the Cimarron river was by avulsion and not accretion. In that case, however, the evidence showed that large quantities of soil fell into the water in one body, "some of the witnesses testified that during one flood lasting four or five days as much as 300 feet of the land would be washed away At one time as much as 25 acres of this defendants' land was thus washed away at one time." The court, therefore, would be justified in finding that the change was perceptible while the process was going on. That case was an equity action and the court found that the judgment of the trial court was not against the clear weight of the evidence. Melton v. Whitney (1933) 164 Okla. 220, 23 P.2d 660.

The defendants Russell, Laura McClain, and the McClain heirs appeal to this court and present the second question for our determination: Whether the intervention of Cache creek bars these defendants from any accretion north and east of the center line of said creek? It is held that "where accretions form to the mainland and a creek then cuts through them the part thus separated from the mainland still belongs to it." DeLassus v. Faherty (1901 Mo.) 64 S. W. 183. In Dowdle v. Wheeler (1905 Ark.) 89 S. W. 1002, the rule is stated thus:

"Where the accretion was begun by a deposit against the shores of the mainland, the subsequent existence of an intermediate stream between the mainland and the accretion does not prevent the accretion from belonging to the owner of the mainland."

In both of these cases the courts held that the owner of the mainland was entitled to the accretion on the other side of the stream. However, Crandall v. Smith (1896 Mo.) 36 S. W. 612. held that "a riparian owner cannot claim, as accretion, land beyond a well-defined slough 40 to 60 yards wide which was the old channel of the river and through which water runs in certain seasons deep enough for navigation." From these authorities, the governing test appears to be whether there has been accretion formed against the mainland which is subsequently cut across by the intermediate stream. The cases relied on by plaintiffs dealing with the doctrine of submergence (Fowler v. Wood, 73 Kan. 511, 85 P. 763) and those cases involving the ownership of land formed by the filling in of a channel between an island and the mainland (Frank v. Goddin (Mo.) 91 S. W. 1057; Nix v. Pfeifer (Ark.) 83 S W 951; Hahn v. Dawson (Mo.) 36 S W. 233) are not in point and throw no light upon the questions presented in the present controversy. DeLassus v. Faherty, supra, is a clear case where the accretion has already

formed and after it was formed the creek cut a new channel through the new formation. Crandall v. Smith, supra, is a clear case where there was no accretion ever forming against the mainland. Dowdle v. Wheeler, supra, however, presents the intermediate case. In that case "there was a deposit against the shore line before the water of the river receded, that this process continued until the bed of the river rose to the level of the creek's bed. and that then, as the water receded, the flow from the creek prevented further deposits in its extended channel and established a permanent channel along the old bed of the river." Inasmuch as accretion, by its definition, must be a continuous deposit and not saltatory, the theory undoubtedly is that the deposit of alluvium was formed against the shore of the mainland and in the bed of the river underneath the stream before the stream cut across and acquired a well-defined channel. In the case at bar the trial court found: "That as Cache creek extended east down the old channel of the Arkansas river that it did not cut off any accretion to its north which had been formed in front of the lands of the defendants Babcock, Russell, McClain, Ainsworth. et al." This finding must have been on the theory that the creek replaced the river in the identical channel of the river, but the record does not disclose evidence reasonably tending to support such a theory. The evidence merely shows that Cache creek is a "well-defined" creek .50 to 80 feet wide and that "it meanders" in the old river bed. On the other hand, it is found by the trial court that there was a strip of accretion formed in front of the lands of the defendants Babcock, Russell, McClain, Ainsworth, et al., this accretion attaching to the northern boundary line of these defendants. From such a fact. the court in Dowdle v. Wheeler supra, points out that: "This goes to show that there was a deposit against the shore line before the waters of the river receded, that this process continued until the bed of the river rose to the level of the creek's bed. and that then, as the waters of the river receded, the flow from the creek prevented further deposits in its extended channel and established a permanent channel along the old bed of the river." Although, in the case at bar, the evidence in this connection is obscure, from our examination of the record, the situation appears to be exactly like that in Dowdle v. Wheeler as the facts appear in that opinion, and we believe that the application of the theory that the deposit was formed against the shore of the mainland and in the bed

of the river underneath the stream and on beyond the creek as the river receded is consistent with the physical facts. The evidence establishing Cache creek as occupying a bed 50 to 80 feet wide in contrast to the Arkansas river occupying a bed of between one-fourth to one-half mile wide is material with respect to this theory, for probably. such a view could not be adopted if the intermediate stream were as great or nearly as great as the receding river. We find no competent evidence to support the judgment of the trial court in this respect.

■ The rule for dividing land found to be accretion is stated in Johnston v. Jones, 66 U. S. 209, 222, 17 L. Ed. 117, as follows:

"'The rule is—1, to measure the whole extent of the ancient bank or line of the river, and compute how many rods, yards or feet each riparian proprietor owned on the river line; 2, the next step is, supposing the former line, for instance, to amount to 200 rods, to divide the newly formed bank or river line into 200 equal parts and appropriate to each proprietor as many portions of this new river line as he owned rods on the old. Then, to complete the division, lines are to be drawn from the points at which the proprietors respectively bounded on the old, to the points thus determined, as the points of division on the newly formed shore. The new lines thus formed, it is obvious, will be either parallel, or divergent, or convergent, according as the new shore line of the river equals, or exceeds or falls short of the old.' It may require modification, perhaps, under particular circumstances. For instance. in applying the rule to the ancient margin of the river, to ascertain the extent of each proprietor's title on that margin, the general line ought to be taken, and not the actual length of the line on that margin, if it happens to be elongated by deep indentations or sharp projections. In such case, it should be reduced by an equitable and judicious estimate to the general available line of the land upon the river.'"

We direct an application of this method for a division of the accreted land among the parties entitled thereto. whose lands lay on the south and west side of the river as it was in 1897. using the south bank of the river as it was at that time as the ancient river line, and the south bank of the river in 1927 as the newly formed river line. The judgment is reversed, with directions to proceed in accordance with the views herein expressed.

RILEY, WELCH, PHELPS, GIBSON, and DAVISON, JJ., concur. OSBORN, C. J., BAYLESS, V. C. J., and CORN, J. absent.