## UNITED STATES v. FLOWER et al.
### No. 11435.

Circuit Court of Appeals, Eighth Circuit.
Dec. 27, 1939.

Rehearing Denied Feb. 15, 1940.

Vernon L. Wilkinson, Associate Atty., Department of Justice, of Washington, D. C. (Norman M. Littell, Asst. Atty. Gen., and Thomas E. Harris, Atty., Department of Justice, of Washington, D. C., on the brief), for appellant.

Amos M. Mathews, of Chicago, Ill. (J. W. Kindig and F. F. Faville, both of Sioux City, Iowa, on the brief), for appellees.

Before THOMAS and VAN VALKENBURGH, Circuit Judges, and DEWEY, District Judge.

DEWEY, District Judge.

This suit was brought by the United States on behalf of the Winnebago Tribe of Indians to recover certain lands which lie in the Missouri River bottom. It was claimed that about 4000 acres were accretions to lands which had been allotted to the Indian Tribe.

The suit was brought in equity but as the plaintiff did not have possession and the defendants were in possession under claim of right adverse to the plaintiff, the court directed the case to be docketed as a law action. It was tried on the law side; a jury having been waived. After issues joined, extensive evidence was introduced and the trial judge filed a written opinion and made findings of fact and conclusions of law.

The general situation is outlined by the judge's opinion as follows:

"Under the treaty of 1875 the tribe became the owner among other lands of fractional township 26 North Range 10 East the Sixth Principal Meridian situated on the right or Nebraska bank of the Missouri River. The river at that time made a loop around the fractional township causing the land to appear on the map like a pear shaped peninsula projecting southeastward from the main body of the reservation.

"Lands across the river on the left or Iowa side were surveyed in 1852 and the meander of the river along its left bank at that time is shown by that survey. The meander on the right bank is shown from surveys made in 1867 and 1875. Surveys of 1879, 1890 and 1927 show the meander on both banks. Between 1875 and 1916 the size of the loop made by the river around the peninsula increased and the water flowed in a wider curve further to the northeast, to the east and to the south and then in 1916 the river suddenly made a new and shorter channel, eliminating a large part of the loop and cutting across the fractional township of the tribe from the northeast towards the southwest so that ultimately a considerable area of land contiguous to the northeast, east and south of the fractional township became dry and arable. Such contiguous lands originally lay either in the bed of the river or upon the Iowa side of the river where they were included in the Iowa survey of 1852 and the government claims that they are all accretions to the tribal lands in Nebraska, and it has undertaken the burden of proving the claim by the several surveys and by the testimony of lay and expert witnesses."

The findings of fact made by the court, insofar as they bear upon the questions here for determination, are as follows:

"9. That the main channel of navigation of the Missouri River formed the boundary line between the sovereign states of Nebraska and Iowa in 1852."

"11. That the western boundary of the State of Iowa is the middle of the main channel of navigation of the Missouri River at the time Iowa was admitted to the Union, except in such instances as such channel may have been changed by accretion under such circumstances as to vary said state boundary line from its original establishment."

"15. Some time between 1870 and 1879 an avulsion changed the channel of the Missouri River from its then location on the northerly boundary of fractional Sections 31 and 32 in Woodbury County and thereafter the river ran in almost a straight line from east to west for about two miles from the east line of Section 4 across Sections 4, 5 and 6 in Monona County.

"16. That by said avulsion, the boundary line between Iowa and Nebraska south of the Tribe's fractional township and the southern boundary line of the Tribal lands in such fractional township were left unchanged along the center line of the river channel as it was before the avulsion. Such line was approximately a line running east and west parallel with and ¼ mile north of the boundary line between Woodbury County and Monona County as extended.

"17. That at the time of said avulsion some original Iowa land was left intact in said fractional Sections 31 and 32 in Woodbury County, Iowa."

"20. That a material and substantial portion of said original Iowa land has ever since said avulsion occurred between 1875 or thereabouts and 1879 or thereabouts existed intact until the present time.

"21. * * * The evidence shows that the channel did make substantial movement to the eastward so that the court approximates the centre of the channel at the time of the avulsion of 1916 as being the east line between Sections 34 and 33 and 27 and 28 in Woodbury County."

And as a conclusion of law the court found: "That the plaintiff is the owner and entitled to a judgment in ejectment for and damages for wrongful occupancy of that part of the land described in the petition

which lies within the following boundary line, to-wit: Beginning at a point where a line parallel with and ¼ mile north of the boundary line between Woodbury and Monona Counties extended west intersects the river, thence north and northeasterly along the left bank of the river to the point where the middle east and west line of Section 28 T. 86 N. R. 47 W. 5th P. M. Woodbury County intersects the river, thence east on said line to the east line of said Section 28, thence south 1¼ miles, thence west to point of beginning."

Judgment was entered accordingly.

The appeal was from the entire judgment, except as to a tract of 40 acres claimed by an individual, and about which there was no dispute.

After the appeal the Government by writ took possession of that part of the Iowa land which had been awarded to it by the court, north of a line running east and west parallel with and one-fourth of a mile north of the boundary line between Woodbury and Monona Counties, Iowa.

And in this appeal the Government seeks to have reviewed the judgment of the court as to that part of the tract claimed by it in its petition, and which was denied by the trial court, as lying south of the line above described and without reference to its right to retain the land awarded to it by the court lying north of said line, basing its right to do so upon its claim that questions regarding the tract south of said line present questions of law and fact separate and distinct from those which were presented by its claim to the area north of that line.

This position of the government was first taken in the bill of exceptions.

The Government has also limited the questions for review, as shown by its statement of points relied upon and in its argument, to the following questions:

"The Government has preserved for review the trial court's refusal to make findings respecting:"

(a) the size and location of the area in Sections 31 and 32 (Iowa survey), which was cut off and placed on the Nebraska side of the river by the avulsive change in the 70s.

(b) the length of the shore line of the tribal lands along the Nebraska high bank and along the southern part of fractional township 26 (Nebraska survey), in so far as those lands continued to be riparian immediately after the aforesaid avulsion; and

(c) the location of the main channel of the river at the time of the avulsion in 1916.

These assignments cover in general the statement of points relied upon for a reversal and no other assignments of error being so relied upon or argued in the brief, they are deemed waived. Kattelman v. Madden, 8 Cir., 88 F.2d 858, 863.

The court found that sometime between 1870 and 1879, and at a time when the river was looping around the Indian lands, known in the record as fractional township 26 (Nebraska), an avulsion occurred, changing the channel then flowing east and west, south of the Indian lands. And the court found that at that time the center or thread of the main channel was approximately on the line parallel with and one-quarter of a mile north of the east and west line between Woodbury and Monona Counties, Iowa; and in substance, that after the avulsion the channel of the river on the east continued south for at least a quarter of a mile and into Monona County, Iowa, and thence west approximately on an east and west line parallel with the Woodbury and Monona County line, above referred to, to the Nebraska high bluffs, and thence south along said bluffs. (Facts 15, 16 and 21).

It is the contention of the Government that after the avulsion of the 70s the tribal lands along the Nebraska high bank (Sections 24, 25 and the Southeast Quarter of Sec. 13—Nebraska), the "Iowa cut-off" (the small segment in Sec. 31 and 32, Iowa Survey), and the tribal lands in the Nebraska peninsula to the east (fractional township 26, Nebraska), were riparian to the right bank of the Missouri River. And upon this assumption the court was asked, and refused to find, what portion of the riparian north bank was then Iowa and Nebraska land and what, if any, part of the Nebraska land on the west was riparian after the avulsion. Also, to find and determine the furthest extent to which the main river channel extended to the east and south to determine the area claimed by the Government.

The purpose and effect of the three requests of the Government for findings of fact have to do with the same general subject, which is, that if the court would determine the exact boundaries and owners of the riparian land, and the extent of the area claimed by the Government, after the avulsion, it could then be shown that the

court was in error in its application of the law to the facts.

There are several reasons why the denial of these requests for additional findings of fact by the trial judge should stand approved. The more conclusive are: 1st, that the Government presents no questions which may here be reviewed, and 2nd, that the facts as found by the court and from which no exceptions were taken or review asked are conclusive that all of the land on the right or north bank of the river, after the avulsion, was Iowa land and that all accretions thereafter adhered to and were a part of such Iowa land.

■ As to the first: This is an action to review errors alleged to have been made in the trial of a law action. It has been decided that there is open to review in such cases only the question whether the special findings support the judgment, or whether there is substantial evidence to support the findings. Mandel Bros. v. Henry A. O'Neil Inc., 8 Cir., 69 F.2d 452, 455; St. Louis v. Rutz, 138 U.S. 226, 241, 11 S.Ct. 337, 34 L. Ed. 941. And this upon the ground that a congressional statute, Sec. 879, Title 28, U. S.Code, 28 U.S.C.A. § 879, limits review to questions of law. Southern Surety Co. of Des Moines, Iowa v. United States, 8 Cir., 23 F.2d 55, 59. No such attack, unless by inference, is here made, but the Government requested the trial court to make certain additional findings of fact and then, assuming that such facts were so found, contends that a rule of law regarding the apportionment of accretion lands should have been applied.

■ The Government assumes that after the avulsion the river was still abutting the southeast portion of the Indian lands on the pear shaped peninsula, and abutting some of the Indian lands or accretions thereto on the west and southwest. This assumption appears to have been reached from excerpts taken from the judge's opinion. It is not the opinion that controls, however, but the findings of fact made by the trial judge. Saltonstall v. Birtwell, 150 U.S. 417, 14 S.Ct. 169, 37 L.Ed. 1128.

After the avulsion of the 70s and between that time and the avulsion of 1916, which took the channel of the river out of this territory entirely, the river had rapidly extended as much as three miles south and two miles east to the Iowa high bank in a constantly enlarging bend. It is the Government's claim that the main channel of the river also was so extended and that aft-

er the river thus expanded its loop all land therein was accretion to the right bank of the river irrespective of whether or not it was alluvium; and that this area should be apportioned among the tracts riparian to the right bank as it existed in 1879, so as to give to each the same proportion of new shore line as it had of old shore line, and this under a rule of law that in apportioning alluvion between former riparian owners, each riparian owner is entitled, as nearly as possible, to his former means of access to the stream. It must also be its theory that with the expansion of a loop in a river such proportionate area automatically became the unconditional property of the former abutting owners, as here at the time of the trial there was no river to the south or east of the peninsula. The avulsion of 1916 changed the course of the channel over and across the original Indian lands, known as fractional 26, Nebraska, with plenty of access thereto.

As a basis for its application of the law as to proportionate division of accretion to the former riparian property owners, the Government requested, and the court refused, to locate the main channel of the river as being its furthest reaches to the east and south at the time of the avulsion of 1916. By this request the Government either disregards or impliedly challenges fact No. 21, locating the main channel east of the area at the time of this avulsion.

■■ To review the court's finding locating the north and south main channel of the river just before the 1916 avulsion would require the consideration of evidence as to the river's location to the east of the area and north of the east and west line as fixed by the trial court, and this cannot be done as such evidence is not preserved by the bill of exceptions. Southern Surety Company v. United States, supra, 23 F.2d at page 58. Having accepted the benefits of that portion of the judgment fixing the thread of the north and south line of the river on the east of the disputed area (Fact No. 21), the Government is now estopped from questioning that finding. Kaiser v. Standard Oil Co., 5 Cir., 89 F.2d 58.

What the court did find as to boundaries is not challenged by assignments of error as being a special finding of fact without support of substantial evidence.

■ Secondly, the facts found by the court conclusively establish that all the area which the Government claims on this appeal, is Iowa land.

The court found that after the avulsion the new channel of the river was parallel to and from one-fourth to three-fourths of a mile south of the former channel. And this placed a strip of original Iowa main land, formerly surveyed as such, of that width between the former channel and the new channel to the south. And the court definitely fixed the main thread of the river on the east and gave the Government all Iowa land west thereof.

■ The avulsion left unchanged the boundary line between Iowa and Nebraska south of the tribe's fractional 26 and it left unchanged the center line of the river channel before the avulsion.

"The law is plain that the original boundary line between Nebraska and Iowa as well as the boundary line between the lands belonging to the tribe and the lands belonging to others continues to be in the middle of the main channel of the river unless the river has made a sudden and rapid change in its channel, abandoning an old bed and making a new one; that is, unless avulsion has occurred, in which event, the middle of the original channel remains the boundary. Shapleigh v. Mier, 299 U.S. 468, 470, 57 S. Ct. 261, 81 L.Ed. 355, 113 A.L.R. 253; Missouri v. Nebraska, 196 U.S. 23, 35, 25 S.Ct. 155, 49 L.Ed. 372; Nebraska v. Iowa, 143 U.S. 359, 361, 367, 370, 12 S.Ct. 396, 36 L. Ed. 186; Arkansas v. Tennessee, 246 U.S. 158, 170, 38 S.Ct. 301, 62 L.Ed. 638, L.R.A. 1918D, 258. Under the law of Nebraska riparian owner is entitled after the river bed has been abandoned by avulsion to claim the land in the river bed up to the middle of the old main channel. Independent Stock Farm v. Stevens, 128 Neb. 619, 259 N.W. 647, 648; Kinkead v. Turgeon, 74 Neb. 573, 580, 104 N.W. 1061, 109 N.W. 744, 1 L.R.A.,N.S., 762, 7 L.R.A.,N.S., 316, 121 Am.St.Rep. 740, 13 Ann.Cas. 43." (Excerpt from opinion of trial judge.)

■ On the west the river both before and after the avulsion ran south on the west side of the area in controversy and down the Nebraska bluffs, which were from 100 to 250 feet in height. The action of the river was such that it created a deep channel with a swift moving, scouring current on the west of the area claimed and next to the Nebraska high bank so that no alluvium could be deposited there. To say that any of the area of the land claimed here was accretion to the Nebraska bluffs on the west of the river would be to say that the accretion was a part of the Nebraska land, which at all times lay on the opposite side of the river. As to this contention, as well as to any contention that the lands in controversy were accretions to the southern portion of fractional Section 26 (the pear shaped peninsula), the courts, including Nebraska, have consistently held that there must be actual affixing of the accretions against the riparian lands before they can be claimed as a part of such lands. The right of title and possession of land formed by accretion follows the ownership of the riparian lands to which it is attached. Nugent v. Mallory, 145 Ky. 824, 141 S.W. 850; Dowdle v. Wheeler, 76 Ark. 529, 89 S.W. 1002, 113 Am.St.Rep. 106; DeLassus v. Faherty, 164 Mo. 361, 372, 64 S.W. 183, 58 L.R.A. 193; Goins v. Merryman, 183 Okl. 155, 80 P.2d 268; Independent Stock Farm v. Stevens, 128 Neb. 619, 259 N.W. 647.

The special findings of fact and this undisputed evidence as to the west boundary made the findings requested unnecessary and irrelevant to the court's conclusions of law fixing the boundaries of the area in dispute and awarding to the Government the land to which it was entitled by such special findings.

Affirmed.