Vera **BUCHHEIT** et al., Plaintiffs in Error,

v.

Roy **GLASCO**, Helen L. Proctor, Ruth I. Brush, Frances Ann Haney, as the Administratrix of the estate of Francis J. Ferry, deceased, et al., Defendants in Error.

No. 39033.

Supreme Court of Oklahoma.

May 9, 1961.

Luttrell & Luttrell, Norman, George Bingaman, Purcell, Frank Dennis, Oklahoma City, for plaintiffs in error.

Hardin Ballard, Purcell, S. M. Groom, Jr., Oklahoma City, for defendants in error.

BERRY, Justice.

The parties will be referred to as they appeared in the trial court, which is in reverse order to their appearance here.

By this action, plaintiffs seek to establish their ownership to all of Lots 7 (9.50 acres) and 8 (12.6 acres) which lie on the West side of the SW/4 of Sec. 27, T. 8N, R. 2W, McClain County, Oklahoma. The described land was at one time a part of the Chickasaw and Choctaw Nation. Plaintiffs trace their title to a patent issued to a member of said Nation.

Defendants own Lots 5 (18.37 acres) and 6 (12.70 acres) which lie immediately East of Lots 7 and 8 but which are in Cleveland County, Oklahoma. As originally surveyed in 1898, the East line of Lots 7 and 8 was the center or medial line of the South Canadian River, hereafter referred to as "river", and the West line of Lots 5 and 6, as originally surveyed in 1873, was said medial line. As of date of said surveys, Lots 7 and 8 were in the Indian Territory and Lots 5 and 6 were in the Oklahoma Territory, which Territories became a part of the State of Oklahoma in 1907. Prior to 1903, the river, which is non-navigable and flows to the South, was approximately 400 feet wide at the point where it bisects the lots. As a result of a flood occurring in 1903 and one in 1904, the river cut away its West or right banks to the extent that all of Lots 7 and 8 except a small area in the Southwest corner of Lot 8 became a part of the river bed. Defendants assert that the boundary line of their lots is the center or medial line of the river bed as same has existed since 1904, which claim is based on the doctrine of accretion. The defendants therefore claim to own a substantial portion of Lots 7 and 8.

Following trial of case to the court, judgment was entered in favor of plaintiffs and against defendants. From order denying their motion for new trial which was directed to said judgment, defendants appeal.

The material portion of the court's judgment is this:

"(d) On or about May 28, 1903, and October 3, 1904, great floods occurred on the South Canadian River, and at the place involved in this suit, and on or about the above dates, the river suddenly, abruptly, perceptibly and with great rapidity abandoned its ancient bed where it had previously made an 'ox-bow' loop up river from the land in question, and running directly across this loop cut a 'new channel' to the west of its old or ancient bed. These changes took place during a period of one or two days. Prior to the 1903 flood, the ancient bed of the river was located as shown by the United States Government Surveys described above, and after the 1904 flood the right bank of the river had moved west to a point substantially as shown by the Survey of R. W. Thomas of July 15, 1957, and being 'Exhibit A' of plaintiffs' petition. These changes in the location of the river constituted avulsions and worked no change of boundary or ownership. The east boundary of plaintiffs' land has at all times remained, and now is, the center or medial line between the original United States Government Surveys, described above, as though said river had not changed its course or channel."

The sole issue presented by this appeal is whether the action of the river in cutting away its West or right bank at the point where it bisects the property in controversy constituted accretion or avulsion. The parties agree that if said action constituted avulsion, the trial court did not err in rendering judgment for plaintiffs but if said action constituted accretion, the trial court erred.

The facts bearing on the referred-to issue are these: During the Year 1903, a flood occurred on the river. There was an

ox-bow in the river to the Northwest of the lots. The force of the floodwaters was such as to cause the river to cut a new channel across the ox-bow and across Lot 7 which lies to the North of Lot 8. Following the flood, a portion of Lot 7 was to the East of the new channel and a portion was to the West. The banks of Lot 8 and the banks of Lots 5 and 6 were not affected by the flood. As we understand defendants' contention, it is not contended that the action of the floodwaters served to change the boundary line between Lots 7 and 8 and Lots 5 and 6.

In 1904, an unprecedented flood occurred on the river. As a result of said flood, all of Lots 7 and 8, except a small portion of the Southwest corner of Lot 8, became river bottom. In fact, a portion of the land to the West of Lots 7 and 8 also became a part of the river bed. This flood did not change the banks of Lots 5 and 6. The West or right bank of the river, at the point in controversy has not in fact changed since said flood occurred. The parties stipulated in part that it was "agreed that there has been no substantial change in the location of the East or left bank of the South Canadian River through the SW Quarter of Section 27–8N–2W subsequent to the date of the original Government Survey in 1872."

The parties further stipulated in part that it was "agreed that the South Canadian River at the point here in question is a non-navigable stream with a bed of relatively loose sand over which the water is well distributed when there is a substantial volume; that the river has no channel of any permanence other than that of which this said bed is the bottom. That the right bank of the river at the point here in question is also a loose, sandy soil. In normal times there is very little, if any, water in the river and at other times when there is a substantial volume of water it spreads over the entire channel from bank to bank."

Plaintiffs and their predecessor have always paid ad valorem taxes assessed on Lots 7 and 8 and have also executed oil and gas leases covering minerals underlying said lots. It was after oil was discovered on a unitized area which embraced said lots that defendants asserted ownership to the West portion of same.

It is possible at this time to determine by a survey the boundary line of Lots 7 and 8 and Lots 5 and 6 as fixed by the original surveys and said line was in fact determined by a survey that plaintiffs caused to be made.

Defendants contend that (1) "There was no sudden removal of land from the West bank to the land on the East bank"; that (2) "There was no sudden change in the course of the river, the river merely widened itself"; that (3) "No part of the land on the West side of the river was cut off and joined to the land on the East side" and for said reason avulsion did not occur.

At the time the floods occurred, Lots 7 and 8 were in the Indian Territory, and Lots 5 and 6 were in the Oklahoma Territory. The action of the floodwaters resulted in either accretion or avulsion and the parties agree that the common law pertaining to accretion and avulsion apply. The parties further agree that plaintiffs' action is one at law (Goins et al. v. Merryman et al., 183 Okl. 155, 80 P.2d 268) and that the judgment of the trial court should not be reversed if there is any competent evidence reasonably sustaining it.

The defendants rely to a considerable extent upon our decision in State ex rel. Com'rs. of Land Office v. Warden et al., 200 Okl. 613, 198 P.2d 402, 403. In the cited case, the question involved was whether the boundary line of land abutting upon the South Canadian River was the medial line of the river as established by the original survey of the land or by the medial line of the river following the gradual washing away of its banks by floodwaters. In the third and fourth paragraphs of the syllabus to the case, this was said:

"3. The doctrine that a river continues to be a boundary, notwithstanding erosion and accretion, applies notwithstanding that, during periods of

high water, the changes in the banks are rapid and material.

"4. The medial line of the channel extending from one cut bank to the other, which carries the water in times of substantial flow, is what is meant by the terms 'middle of the main channel' and 'mid channel' of a non-navigable river, and same is held to be applicable to the South Canadian River where it is involved herein."

The facts of the above cited case readily distinguish said case from the instant case. The evidence in that case showed that "the north bank washed away rapidly in the flood of 1904 and more rapidly than in subsequent floods"; that the bank "builds up and washes away and keeps changing." In this case, as heretofore noted, the East bank of the river has not changed since the 1873 survey and the West bank has not changed since the 1904 flood. The change in the West bank occurred suddenly and perceptibly as a result of the 1903 and 1904 floods.

Defendants stress the third paragraph of the syllabus to the Warden case which is quoted supra. The syllabus must be construed in the light of the facts to which it is directed. When so construed, it is apparent that this Court there intended to say that the doctrine of accretion would be applied where there is a gradual change in the bank or the banks of a river over a long period of time, notwithstanding changes during periods of high water are rapid and material.

In the body of the Warden case it is stated in substance that avulsion occurs when the land of one person is suddenly removed and becomes a part of the land of another. The defendants assert that since the land lost from Lots 7 and 8 was not deposited against the East or left bank of the river and since no land was in fact deposited against said bank, the doctrine of avulsion is not applicable. We are unable to agree.

In a text denominated "American Law of Property", Vol. III, Sec. 15.26, p. 855, avulsion is defined as follows:

"Avulsion is the sudden change of the banks of a stream such as occurs when a river forms a new course by going through a bend, the sudden abandonment by a stream of its old channel and the creation of a new one, *or* a sudden washing from one of its banks of a considerable quantity of land and its deposit on the opposite bank." (Emphasis supplied.)

As sustaining the proposition that application of the doctrine of avulsion is not contingent upon land which is suddenly washed away by a flood becoming a part of the land of another, or of soil washed by the flood from the land of others being deposited on the land of another, see Mapes et ux. v. Neustadt, 197 Okl. 585, 173 P.2d 442; People v. Steeplechase Park Co. et al., 82 Misc. 247, 143 N.Y.S. 503; Harper et ux. v. Holston et al., 119 Wash. 436, 205 P. 1062, and cases cited following the word Avulsion, Vol. 4, Words & Phrases.

In the first paragraph of the syllabus to Mapes et ux. v. Neustadt, supra, we said that "Changes in riparian status by reason of avulsion does not work a change in boundaries." See also Willett v. Miller et al., 176 Okl. 278, 55 P.2d 90. This appears to be a rule that is recognized and followed by practically all courts in this country. See 56 Am.Jur. "Waters" Sec. 477, p. 892.

The authorities appear to be in agreement on the proposition that the doctrine of avulsion is only applicable where the loss of land is sudden and perceptible. See Goins et al. v. Merryman et al., 183 Okl. 155, 80 P.2d 268; Chase et al. v. Cheatham et al., 194 Okl. 1, 146 P.2d 585; State ex rel. Comm'rs. of Land Office v. Warden et al., supra; City of St. Louis v. Rutz, 138 U.S. 226, 11 S.Ct. 337, 34 L.Ed. 941, and 56 Am.Jur. "Waters", Sec. 476, p. 891.

The record clearly shows that the flood of 1903 and that of 1904 were of short

duration; that during the 1903 flood a substantial portion of Lot 7 was suddenly and perceptibly washed away; that during the 1904 flood the remainder of Lot 7 and practically all of Lot 8 were suddenly and perceptibly washed away. It is thus clear that the doctrine of avulsion is applicable, and for said reason the property line between Lots 5 and 6 and Lots 7 and 8 remains as fixed by the original government surveys, and for said reason the trial court did not err in entering judgment for plaintiffs.

Affirmed.

WILLIAM, C. J., and WELCH, DAVISON, HALLEY, JOHNSON, JACKSON and IRWIN, JJ., concur.