333 F.2d 785
 Roger BAUMAN, Trustee for the Jon Roger Bauman Trust Estate
and the Michael Collins Bauman Trust Estate, Appellant,
v.
CHOCTAW-CHICKASAW NATIONS, Heirs of W. E. Rowsey, and United
States ofAmerica, Appellees.
 No. 7512.
 United States Court of Appeals Tenth Circuit.
 June 30, 1964, Rehearing Denied July 27, 1964.
 
 Walter J. Arnote and James B. Bratton, McAlester, Okl. (Arnote, Bratton & Allford, McAlester, Okl., of counsel, were with them on the brief), for appellant.
 W. F. Semple, Tulsa, Okl. (James G. Welch, Oklahoma City, Okl., was with him on the brief), for appellees.
 Before PICKETT, LEWIS, and BREITENSTEIN, Circuit Judges.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 This appeal grows out of a condemnation action brought by the United States to acquire land for the Eufaula Dam and Reservoir Project in Oklahoma. The issues have been reduced to whether appellant Bauman, as trustee, or appellee Choctaw-Chickasaw Nations own Tract L-1240. We are concerned with lands in Sections 20 and 29 which the Canadian River,[1] a non-navigable stream, has crossed in various meandering channels during the last 60-70 years.
 
 
 2
 The government brought action No. 4737 to condemn Tract L-1229 which includes all the South Half, and a narrow strip of the North Half of Section 29, and some land in other sections. Bauman, the successor in title of allottees of the Nations, appeared and claimed all the land in Section 29 and all land in Section 20 south of the thread of the river. The government then brought action No. 5229 to condemn all that portion of Section 29 lying north of Tract L-1229. This area is known as Tract L-1240 and contains about 256 acres. Named as claimants were Bauman, the Nations, the heirs of one Rowsey, and other persons. During the trial proceedings, stipulations and agreements disposed of all issues except the conflicting claims of Bauman and the Nations to Tract L-1240. The trial court held for the Nations and made an appropriate order under Rule 54(b), F.R.Civ.P., to permit this appeal.
 
 
 3
 Prior to 1898 the river took a northerly course through Sections 30, 19, and 20. It then looped through Sections 16 and 15 and turned southerly over Sections 22, 21, and 28. A flood in 1898 created a new channel in Section 22 and caused the river to flow southerly across that section and Section 27.
 
 
 4
 The M.K. & T. railroad runs in a northeasterly-southwesterly direction across Sections 22, 27, and 28. The 1898 flood severely damaged the railroad tracks and bed.
 
 
 5
 In 1898 the United States held these lands as guardian of the Indians. Congress acted to help the railroad by the passage of the Act of June 27, 1898,[2] entitled 'An Act To authorize the Missouri, Kansas and Texas Railway Company to straighten and restore the channel of the South Canadian River, in the Indian Territory, at the crossing of said railroad.' The Act recited the construction of the railroad under congressional authority and the occurrence of unprecedented floods 'resulting in that river overflowing its banks * * * and * * * in the diversion of that river from its old channel * * *, and the formation of a new course some distance to the north of said bridge, washing away the railroad and railroad bed.' The Act further said that 'it is important that the course of said river be restored to the old channel.' The railroad was authorized 'to restore the said river to its original channel,' 'to straighten and shorten the river above said bridge by excavating and constructing a channel' and 'for that purpose * * * to enter upon lands adjacent to said railroad.' The railroad was required to make full compensation for property taken or damaged and, in the event of the impossibility of amicable settlement, had the power to condemn. Section 4 of the Act reads:
 
 
 6
 'That the Missouri, Kansas and Texas Railway Company by such condemnation proceedings and the construction of said channel, and the diversion of the river through same, shall have no other or further rights in and to said river than it now has.'
 
 
 7
 The record is not clear as to what the railroad did pursuant to the 1898 Act. Apparently it condemned a 292.9 acre tract beginning with the river channel in Sections 19 and 30, crossing the southwest corner of Section 20 and the North Half of Section 29, and ending with the river channel in Section 28. The record contains no description of the tract condemned.
 
 
 8
 From 1898 to the present the river has followed various courses through Sections 29 and 30. A railroad map shows different banks and channels in the years 1898, 1900, 1901, 1903, 1906, 1914, 1919, 1920, 1923, and 1924. Other maps show the existing channel which loops through Section 20. In Section 29 the channels are in the North Half and the Northeast Quarter of the Southeast Quarter.
 
 
 9
 As to land in the North Half of Section 29, Bauman holds under a 1914 Unallotted Land Deed from the Nations to one Rowe covering 20.48 acres in the Northeast Quarter and a similar 1917 deed to one Martin covering 45.89 acres in the Northwest Quarter. In each deed the description is by metes and bounds and no reference is made either to the river or to the tract condemned by the railroad.[3] Counsel for Bauman insist that the northerly line of each of these tracts is along either the southerly bank of the river or the southerly line of the railroad tract.
 
 
 10
 In Choctaw and Chickasaw Nations v. Seay, 10 Cir., 235 F.2d 30, 35, certiorari denied 352 U.S. 917, 77 S.Ct. 216, 1 L.Ed.2d 123, a case relating to the Red River, this court said:
 
 
 11
 'Under the common law, a grant of land bounded on a non-navigable river by a grantor who owns to the center or thread of the stream conveys to the grantee the land to the center or thread of the stream, unless the terms of the grant and the attendant circumstances clearly denote an intention to stop at the edge or margin of the river.'
 
 
 12
 Relying on this principle Bauman argues that under the Rowe and Martin deeds the grants went to the thread of the stream.[4] Many difficulties beset this claim. The parties stipulated that the northerly line of the Martin tract is based on the meander lines of the river except the last call which follows the line of the railroad tract. They also stipulated that the northerly line of the Rowe tract follows the south line of the railroad tract. Thus, the northerly line of Martin follows the river for part of its distance and otherwise the northerly lines of both Martin and Rowe follow the south line of the railroad tract. The record shows that the southerly bank of the stream across Section 29 and the southerly line of the railroad tract are not the same.
 
 
 13
 We believe that the rule stated in Seay has no application here. Over the years the Canadian River has repeatedly changed its channel and banks. The maps disclose that this instability has covered an area approximately one mile in breadth from the middle of Section 29 north to the middle of Section 20. Manifest injustice would result if the Seay decision were applied to extend Martin's and Rowe's northerly lines a distance of about one-half mile to the north. This is not a case of gores and strips.[5] Through ownership of the 20-acre Rowe tract and the 45-acre Martin tract, Bauman claims Tract L-1240 containing 256 acres. The Seay decision recognizes that 'attendant circumstances' may preclude the operation of the rule. In the circumstances of this case the fair construction of the Rowe and Martin deeds is to confine them to the lands covered by their metes and bounds descriptions.
 
 
 14
 Bauman's next reliance is on adverse possession. His theory appears to be that as the river channel changed to the north the holders of the Rowe and Martin tracts extended their possession to the southerly river bank. The trial court held to the contrary, finding that there was no adverse possession of any part of Tract L-1240 for the statutory period of 15 years.[6] Substantial evidence sustains this finding and we must accept it.
 
 
 15
 Bauman also relies on the Act of April 26, 1906,[7] which provides for the disposition of the lands of the Five Civilized Tribes. Section 14 of that Act says that upon the abandonment of any right of a railroad 'in the nature of an easement for right of way, * * * or other uses connected with the maintenance and operation of such company's railroad, * * * title thereto shall thereupon vest in the owner of the legal subdivision of which the land so abandoned is a part,' with an exception which is not pertinent. We have construed and applied these provisions of Section 14 in a number of cases[8] but none of them are pertinent to the problem now before us.
 
 
 16
 The right which the railroad acquired in Section 29 are based on the previously mentioned 1898 Act. That Act conveyed to the railroad no title or semblance of title. At the time the United States, as guardian of the Indians, owned all the pertinent land. By the 1898 Act the United States gave the railroad the right to change the channel of the river. Section 4, which we have heretofore quoted, says that the railroad 'shall have no other or further rights in and to said river than it now has.' The record discloses no basis for any railroad right in Section 29 other than that given by the 1898 Act. In our opinion that Act gave no easement to the railroad and, hence, Section 14 of the 1906 Act has no application.
 
 
 17
 The claim of accretion is without merit. 'Accretion' denotes the process by which the area of owned land is increased by the gradual deposit of soil due to the action of a bounding river or other body of water.[9] Accretion occurs when the change in the river is gradual and imperceptible.[10] The gradualness of the process distinguishes accretion from the more rapid, easily perceived, and sometimes violent, shifts of land incident to floods, storms or channel breakthroughs known as 'avulsion.'[11] A sudden change in the channel of a river, as occurs in the case of avulsion, does not affect title to the lands thus transferred from one side of the river to the other.[12]
 
 
 18
 In the case at bar the river changed channels many times. Nothing in the record shows that these changes were gradual and imperceptible. The trial court specifically found that the change to the railroad tract was by avulsion. The finding is not shown to be clearly erroneous and must stand. Under the rules which we have stated this change did not affect ownership of the land previously south of the river but after the change north of the river. When the river returned to the northern channel, the titles to the land in the area intervening between the two channels were not disturbed. We agree with the trial court that Bauman has no claim to any part of Tract L-1240 because of accretion. In our opinion that tract is unallotted tribal land and is owned by the Nations.
 
 
 19
 One matter remains for consideration. The trial court held that the Nations owned all of Tract L-1240 except 20 acres described as the North Half of the Northeast Quarter of the Northeast Quarter of Section 29, and adjudged that this 20-acre tract was owned by the heirs of one Rowsey. The Nations do not object to this portion of the judgment but Bauman does and points out that by stipulation it was agreed that he now owns this tract. The record sustains Bauman and the judgment must be corrected to show that he owns the mentioned 20 acres.
 
 
 20
 Modified and affirmed.
 
 
 
 [1]
 In some of the testimony and exhibits the stream is referred to as the South Canadian River
 
 
 [2]
 30 Stat. 493
 
 
 [3]
 With reference to the tract deeded to Rowe, the Commissioner for the Five Civilized Tribes wrote in 1914 that the Department had approved the sale 'less said condemned area and the area washed away by the river.' The area deeded to Martin was part of Tract No. 1481. With reference to this tract the Commissioner wrote one Rorer in 1914 that: 'Inasmuch as 88.27 acres of this tract had been condemned by said railroad, this office was without authority to dispose of same either by allotment or sale.'
 
 
 [4]
 The argument is unclear as to how this position would help Bauman as to land in Tract L-1240 northerly of the thread of the stream
 
 
 [5]
 See United States v. Magnolia Petroleum Co., 10 Cir., 110 F.2d 212, 217-218
 
 
 [6]
 60 O.S.1961 333 and 12 O.S.1961 93
 
 
 [7]
 34 Stat. 137
 
 
 [8]
 See City of Wilburton v. Swafford, 10 Cir., 253 F.2d 479, and cases cited on p. 482
 
 
 [9]
 Powell on Real Property, vol. 6, P983, pp. 581-583. See 60 O.S.1961 335
 
 
 [10]
 Goins v. Merryman, 183 Okl. 155, 80 P.2d 268, 270; Powell, supra, P984, p. 585
 
 
 [11]
 See Powell, supra, P983, p. 581, note 3
 
 
 [12]
 Buchheit v. Glasco, Okl., 361 P.2d 838, 841; Stockley v. Cissna, 6 Cir., 119 F. 812, 822; American Law of Property, vol. III, 15.29, pp. 861-862