The STATE of Oklahoma on relation of the COMMISSIONERS OF the LAND OFFICE of Said State, Appellant,

v.

John SEELKE and Catherine M. Seelke, husband and wife, Appellees.

No. 50133.

Court of Appeals of Oklahoma, Division No. 1.

Aug. 23, 1977.

Released for Publication by Order of Court of Appeals Sept. 15, 1977.

R. R. Williamson, Jr., Gen. Counsel, Paul E. DeGraffenreid, Asst. Counsel, Oklahoma City, for appellant.

Joe C. Houk, Fairview, E. Blumhagen, Watonga, for appellees.

BOX, Judge:

An appeal by the Commissioners of the Land Office of the State of Oklahoma, plaintiff in the trial court, from a demurrer to the evidence in favor of defendants in the trial court, John and Catherine Seelke, appellees herein. For convenience, appellant will be referred to as the State and Mr. and Mrs. Seelke as appellees.

Upon admission to statehood, the land in controversy, which is contained within Section 36, Township 20 North, Range 10 West, was given in trust to the State of Oklahoma for use and benefit of the common schools. At this time, the State owned Lots 1 through 9 inclusive. According to the original government survey of 1873, this tract was bisected by the Cimarron River with Lots 1 through 5 on the West side of the river, containing approximately 142.70 acres, and Lots 6 through 9 on the East containing 114.55 acres. In 1913, the State conveyed Lots 1 through 5 to the appellees', predecessor in title. There is no dispute that the State has record ownership of Lots 6 through 9 and that appellees are the record owners of Lots 1 through 5 as shown on the original government survey.

In 1968, the State filed an action in ejectment against appellees. The State alleged in its second amended petition that by virtue of accretion the channel of the Cimarron River had gradually moved to the West with the result that over 400 acres of land (including Lots 1 through 5) had accreted and attached to the State's land. Further, the State pled that appellees had no right, title or interest in the land and that appellees had entered the land without authority, committed trespass and unlawfully withheld the State's land by forceable exclusion. The State prayed that appellees be ejected from possession, possession be restored to the State and for such other relief as the court would deem proper.

Appellees admitted that the channel of the Cimarron River has changed and is now a substantial distance to the West of the original government survey. However, they denied any land accreted to the State's land. On the contrary, appellees alleged that the change in the channel occurred as a result of sudden high waters and floods, avulsion and not accretion, and there was no change in ownership of the lands. In addition, appellees cross-petitioned to quiet title to Lots 1 through 5.

Upon trial, the State's first witness was Kenneth Luza, a geologist with the Oklahoma Geological Survey. He testified that in 1941 the main channel of the Cimarron in relation to Section 36 was westward of the original government survey of 1873 but some water had moved eastward with dry vegetated land in the middle. There appeared to have been a widening of the River in 1941. Exhibit B shows that in 1941, the River entered appellees' Lot 1 from the North, extended down through Lot 2 and exited appellees' land from Lot 2 to the East. The River also had entered the State's land primarily running across Lots 9 and 8.

Further, Mr. Luza testified that by 1951 the water to the West that had previously been on appellees' land had dried up and the body had moved back eastward onto the State's land. However, by 1954 the Cimarron River had moved back to a position very similar to the original government survey, bisecting the two plats in controversy. From 1941 until 1957, the change in the River was gradual and subtle and prior to 1957, the tread of the stream stayed within Section 36.

Sometime during 1957, the stream cut across its medial route. About ½ mile northeast of the northwest corner of Section 36, the river instead of making a curve to the East straightened out and went more or less South. Mr. Luza testified this occurred within a fairly short period of time and an increase in the volume of water changed the bed of the stream. Mr. Luza deduced from the flow data of the gauging stations along the Cimarron River that a substantial amount of water from rain flowed through the area on May 15 or 16, 1957. The result was shown on an aerial photograph taken in August, 1957. The

main channel was almost to the West of Section 36, entering appellees' Lots 3, 4 and 5 and exiting Lot 5 on the South. In other words, the bulk of Lots 1 through 5 instead of being to the West of the River were after 1957 on the East of the River. According to Mr. Luza, there was no dramatic change in the River from 1957 to the present.

The State's next witness was Buster Lehenbauer, whose father at one time held a school land lease on Lots 6 through 9 and who was familiar with Section 36. He testified that for a long period of time prior to 1957 the River had gradually moved East toward his father's pasture causing him and his father to move fences inward on Lots 6 through 9. The River then went back West. Until 1957, there was no dramatic change. Mr. Lehenbauer testified to a flood in May of 1957 causing a drastic change in the River:

> Well, back within a year or so you could tell that the River had went way back to the west.

> .    .    .    .    .

> Well, the river is pretty much back over there now and a lot of that land that used to be on the west side of the river is on the east side with vegatation. .    .    .

After 1957, Mr. Lehenbauer stated he had not seen any drastic changes.

The State next presented as a witness Mr. Charles Mankin, professor of geology and director of the Oklahoma Geological Survey. In general, according to Mr. Mankin, there is a gradual southwesterly migration of the Cimarron River throughout Oklahoma at a rate of a foot per year for around 500,000 years. He testified that the active channel had moved within Section 36 considerably to the West in 1957 compared to 1951. Mr. Mankin stated:

> The high water appears to have changed the position of the active course of the stream. From 1954 to the 1957 photographs there was a change in the active course of the stream. I cannot testify and cannot state with certainty that it was a direct consequence of that particular high water condition. It is reasonable to assume that the active course of the stream would have been changed as a consequence of that, but I cannot state with certainty that that, in fact, did occur.

Between 1957 and 1964, only minor erosion of the west bank particularly within Section 35 occurred.

After the State presented the foregoing evidence, appellees withdrew their cross-petition and demurred to the State's evidence. The trial court granted the demurrer to the State's evidence; the evidence was insufficient for any relief requested in the State's second amended petition. The effect of the court's ruling was to hold that the change in the River resulted from avulsion, not accretion, and that the boundary between the parties' land was as shown on the original government survey. The State contends the trial court erred in granting appellees' demurrer to the evidence.

■ The distinction between accretion and avulsion was summarized by the Supreme Court in *Olsen v. Jones,* 412 P.2d 162, 163, wherein the court held:

> Syllabus by the Court.
>
> 1. Accretion denotes the process by which the area of owned land is increased by the gradual deposit of soil due to the action of a bounding river or other body of water. Accretion occurs when the change in the river is gradual and imperceptible. The gradualness of the process distinguishes accretion from the more rapid, easily perceived, and sometimes violent, shifts of land incident to floods, storms or channel breakthroughs known as avulsion. A sudden change in the channel of a river, as occurs in the case of avulsion, does not affect title to the lands thus transferred from one side of the river to the other.

See also *Buchheit v. Glasco,* Okl., 361 P.2d 838. Where the bed of a river changes by accretion, the boundary line bordering upon the river changes with it, but if the change is by avulsion, the boundary line remains as it was originally. See *Mapes v. Neustadt,* 197 Okl. 585, 173 P.2d 442; *Goins v. Merryman,* 183 Okl. 155, 80 P.2d 268.

■ The State brought a cause of action in ejectment contending it was entitled

to possession of the major portion of Lots 1 through 5 by virtue of accretion. The trial court sustained a demurrer to the State's evidence. Where a demurrer to plaintiff's evidence is sustained and it is apparent from an examination of the evidence that plaintiff wholly failed to prove his case, the judgment will be affirmed. *Wilson v. Chicago, Rock Island & Pacific Railroad Co.,* Okl., 429 P.2d 763; *Pitts v. First State Bank of Caddo,* Okl., 390 P.2d 867; *Davis v. Lugert-Altus Irrigation District,* Okl., 375 P.2d 975; *Arrington v. Young,* Okl., 366 P.2d 400. Furthermore, in an action tried to the court where the trial court has treated the demurrer to plaintiff's evidence as a motion for judgment in favor of defendant, the judgment which the trial court renders after having weighed the evidence will not be reversed on appeal unless it is against the clear weight of the evidence. *Smiley v. Jaggers,* Okl., 327 P.2d 652. The trial court held that the State (plaintiff) wholly failed to prove its case. We agree.

■ Briefly summarized the evidence and exhibits presented by the State show that in 1954 the Cimarron River was in a position very similar to the original 1873 survey. The flood of May, 1957 caused the River to change its course with Lots 1 through 5 being basically on the East side of the River whereas before the flood, they were on the West side. Under the tests set forth supra, the change in the channel of the River induced by flooding would be by avulsion, not accretion. The flood occurred May 15 or 16, 1957. The aerial photograph taken in August of that year illustrates that the River had changed to its current course. This is not the gradual and imperceptible change required by accretion (In *Goins v. Merryman,* supra, accretion took place over a 30 year period). Furthermore, Mr. Luza testified the change occurred within a short period of time. The State failed to prove that the change was accretive and the trial court was correct in granting a demurrer to their evidence.

■ The State contends that there is a presumption that change in a river is by accretion, not avulsion, and cite *Chase v. Cheatham,* 194 Okl. 1, 146 P.2d 585, for the proposition that appellees had the burden of proof to show avulsion which they did not sustain because the trial court granted a demurrer to the evidence after the presentation of the State's case. Absent clear evidence to the contrary, the law will presume accretion not avulsion; however, the presumption does not apply where the evidence sufficiently shows an avulsive change. See generally 78 Am.Jur.2d Waters § 427 (1975). The *Chase* case was a suit to quiet title with the plaintiff urging avulsion. Here we have a suit for ejectment and the general rule is that one who asserts title to land on the theory of accretion has the burden of proof as against the party in possession. See 78 Am.Jur.2d Waters § 426 (1975). The State did not sustain their burden of proof and the evidence presented on its behalf showed avulsion. By the State having failed to prove its case and by it having proved avulsion instead of accretion, there was no need for appellees to come forward to present evidence.

■ Next, the State asserts the trial court erred by not determining the boundary lines between the parties. The State sued in ejectment. After appellees withdrew their cross-petition to quiet title and the demurrer to the State's evidence had been granted, no petition was before the trial court to enable it to grant the relief requested by the State on appeal, i. e., to determine boundary lines. Furthermore, where change in the channel of a river is caused by avulsion, the riparian owners' boundary lines remain at the place where the middle of the main channel of the stream was before the freshet or flood (as shown on the original government survey). See *Buchheit v. Glasco,* supra; *Willett v. Miller,* 176 Okl. 278, 55 P.2d 90. The judgment of the trial court is accordingly affirmed.

AFFIRMED.

REYNOLDS, P. J., and ROMANG, J., concur.