TRUSTEES OF the CENTRAL STATES, SOUTHEAST & SOUTHWEST AREAS PENSION FUND, Plaintiffs,

v.

GOLDEN NUGGET, INC., a Nevada corporation; and The Palmieri Company, a California corporation, Defendants.

No. CV 85–2366–AAH (Px).

United States District Court, C.D. California.

Oct. 20, 1988.

As Corrected Oct. 24, 1988.

Donald C. Smaltz, Robert L. Hess, Morgan, Lewis & Bockius, Los Angeles, Cal., for Trustees of the Central States, Southeast & Southwest Areas Pension Fund.

Richard H. Kuh, Robert Fryd, Warshaw, Burstein, Cohen, Schlesinger & Kuh, New York City, Jayson Burton Lumish, Reavis & McGrath, Los Angeles, Cal., for Golden Nugget, Inc. and Clyde T. Turner.

John H. Sharer, Dean J. Kitchens, Gibson, Dunn & Crutcher, Los Angeles, Cal., for The Palmieri Co.

## OPINION AND ORDER RE: POST-TRIAL MOTIONS AND AMENDED AND SUPPLEMENTAL JUDGMENTS

HAUK, Senior District Judge.

### INTRODUCTION

Plaintiffs Trustees of the Central States, Southeast & Southwest Areas Pension Fund (the "Fund") brought suit against defendants Golden Nugget, Inc., Clyde T. Turner (collectively "Nugget") and The Palmieri Company ("Palmieri") to resolve a dispute arising out of the Fund's sale of certain promissory notes, through its agent Palmieri, to the Nugget, and the subsequent prepayment of the notes. The Fund's Second Amended Complaint alleged breach of contract, breach of the covenant of good faith and fair dealing, fraud, common counts, civil violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), and related equitable claims for reformation or rescission and restitution against the Nugget and Turner,[1] and violation of the Employee Retirement Income Security Act ("ERISA") and related state law claims against Palmieri. Nugget filed a counterclaim against the Fund for attorney's fees. Palmieri filed a cross-claim against Nugget for indemnity, contribution and declaratory relief.

The Court dismissed before trial the Fund's common counts and RICO claims against Nugget, and Palmieri's cross-claim. After a 47-day jury trial, the Court granted directed verdicts and dismissed the Fund's fraud and breach of the covenant of good faith and fair dealing claims against Nugget, all claims against Turner, and

1. Only the fraud, and rescission and restitution claims were brought against Turner.

the Fund's breach of contract and negligence claims against Palmieri. The breach of contract claim against Nugget and ERISA claim against Palmieri were submitted to the jury. The jury returned verdicts in favor of the Fund and against Nugget in the amount of $6,874,599 plus pre-judgment interest on the contract claim, and in favor of defendant Palmieri on the Fund's ERISA claim. The Court found in favor of Nugget and against the Fund on the Fund's equitable claims. Judgments were entered on the verdicts and on the findings of the Court.

Before the Court are four post-trial motions. First, the Fund moves the Court to amend the judgment against Nugget to increase and conform the amount of contract damages to the amount stipulated by the parties. Second, the Fund moves the Court to amend the judgment on its ERISA claim against Palmieri, asserting that the Court erred in submitting the ERISA claim to the jury, and that the Fund is entitled to judgment on the merits. Third, the Fund moves for an award of attorney's fees and costs against Nugget. Finally, Palmieri moves for an award of attorney's fees and costs against the Fund.

## FACTS

Plaintiffs are trustees of a pension fund with assets valued at approximately $8 billion. The Fund is an "employee benefit plan" pursuant to ERISA, 29 U.S.C. § 1002(3), based in Chicago, Illinois. Golden Nugget is the proprietor of hotel-casinos in Nevada and New Jersey. Palmieri is an asset management firm which became an independent investment manager of substantial assets of the Fund in 1977.

In 1978, the United States Department of Labor commenced an action in the United States District Court for the Northern District of Illinois against the Fund's then trustees to divest them of the authority to manage and control the Fund's assets. The suit was settled in 1982 when the Fund entered into a Consent Decree with the Department of Labor. Pursuant to that Consent Decree and effective January 20, 1984, Morgan Stanley & Co. ("Morgan Stanley") was appointed "Named Fiduciary" of the Fund, with complete authority to manage the Fund's assets for a minimum of ten years. Morgan Stanley selected Palmieri as an ongoing real estate asset manager and allocated to it for management certain of the Fund's real estate-related assets.

Among the assets allocated to Palmieri for management was a series of variable rate promissory notes (the "Notes") issued by Trans–Sterling, Inc. ("Trans–Sterling") and secured by first trust deeds on Trans–Sterling's Stardust and Fremont Hotel–Casinos in Las Vegas, Nevada.[2] In October of 1984, the prevailing interest rate on the Notes was 13.52% and the outstanding principal balance was approximately $74 million. Payments of $550,000 were due on the Notes on a twice monthly basis, with full payment of any remaining principal and interest due on October 31, 1991. The Notes also contained due on sale clauses, pursuant to which the full unpaid principal and interest of the Notes became due and owing upon the sale of the underlying hotel-casinos.

In April, 1984, Morgan Stanley established an overall investment policy for the Fund which required disposition of certain of the Fund's assets, including the Notes. However, in 1983 Trans–Sterling had lost its gaming license and had been ordered by the Nevada gaming authorities to sell the Stardust and Fremont.[3] As a result of these events, the value of the Notes was diminished. Throughout 1984, Palmieri

---

**2.** The loans made by the Fund in exchange for the Notes were extended prior to 1977, during which time the Fund controlled its own assets and was itself infiltrated by criminal elements. Trans–Sterling acquired the Stardust and Fremont after the loans were made and assumed the obligations to the Fund pursuant to the Notes.

**3.** This action was precipitated by the Internal Revenue Service's discovery that the Stardust and Fremont were engaged in "skimming"—an illegal practice of failing to report certain cash receipts as income.

met with and made proposals to several potential buyers of the Notes, some of whom were also interested in purchasing the underlying hotel-casinos.

In mid-October of 1984, Palmieri began negotiations with Nugget for sale of the Notes. Negotiations were conducted principally by Julian Burke, Executive Vice–President of Palmieri, from the company's Los Angeles office, and Clyde T. Turner, Executive Vice–President, Chief Financial Officer and Treasurer of Nugget. The parties discussed terms during one meeting in Palmieri's Los Angeles office and a series of telephone conversations, and exchanged written proposals. On November 2, 1984, Burke and Turner signed a four-page letter agreement (the "Contract") dated October 31, 1984, for Nugget's purchase of the Notes. The Contract was drafted by Nugget's Vice–President and General Counsel, Bruce Levin, and was set forth on Nugget letterhead.

The Contract provided for a purchase price of $58.6 million, which represented the present value of the twice-monthly $550,000 payments at a minimum of 11.5% interest, discounted to produce a minimum return to Golden Nugget of 20%.[4] In addition, the Contract provided that Nugget would pay to the Fund 50% of Nugget's return in excess of a minimum return of 20% on the occurrence of any one of three contingencies: if interest on the Notes were paid in excess of 11.5% (Paragraph 2 of the Contract), if Nugget sold the Notes to an unaffiliated third party (Paragraph 4 of the Contract),[5] or if Nugget foreclosed on the deeds of trust securing payment of the Notes (Paragraph 4).

The closing on the Contract took place on November 7, 1984 in Las Vegas. Pursuant to a written agreement made at the closing, the parties created a collection account at Valley Bank of Nevada for the deposit of principal and interest payments made on the Notes. Under this November 7 agreement, the Fund held a security interest in the account. Withdrawals from the account could be made only upon the certification of a Nugget officer to the bank and Palmieri setting forth the calculation by which the proceeds of the Notes were being shared between the Fund and Golden Nugget.

On or about February 28, 1985, the Stardust and Fremont Hotel–Casinos, which secured the Notes, were sold. As required by the due on sale clauses in the Notes, the Notes were fully prepaid in the approximate face amount of $73.3 million, producing an immediate profit to Golden Nugget, above the 20% minimum return, in excess of $14 million.

Within one or two days of the sale, Nugget informed Palmieri that the Fund's

---

**4.** Paragraph 2 of the Contract between the Fund and Golden Nugget ("GNI") states, in pertinent part:

2. The purchase price for the Notes shall be approximately $58,600,000 (the "Price"), which GNI shall pay by wire transfer or equivalent cash funds at the closing. The price assumes that interest will be payable on the Notes at the rate of 11.5% per annum and that principal and interest are payable in semi-monthly installments of $550,000, due on the first and fifteenth of each month, with full payment of the balance of the Notes to occur on October 31, 1991 (the "Payments"). Accordingly, the Price shall represent the present value of the Payments (at an assumed annual interest rate of 11.5%) discounted to produce an annual return to GNI of 20% (the "Minimum Return"). If in any quarterly period following the closing, interest on the Notes is paid at an annual rate in excess of 11.5% to thereby produce an annual return to GNI in excess of the Minimum Return, GNI shall, within ten days following the expiration of any such quarter, pay to the Fund 50% of the present value at Closing of such excess ("Excess Payment").

**5.** Paragraph 4 of the Contract states, in relevant part:

4. If, following the Closing, GNI or any affiliate or designee of GNI should sell the Notes to an unaffiliated third party or foreclose on the deeds of trust securing payment of the Notes, and in either of such events, receive payment in cash or other property (other than the Properties) which payment shall produce a cumulative return from the Closing to GNI in excess of the Minimum Return, GNI shall, within ten days thereafter, pay 50% of such Excess Payment to the Fund (less all Excess Payments theretofore made by GNI and all legal fees and other expenses which may have been incurred by GNI in any foreclosure or insolvency proceedings with respect to the Notes or involving the obligor thereon).

share of such prepayment was $111,476, which represented 50% of the interest received in excess of 11.5%, pursuant to Paragraph 2 of the Contract. Nugget withdrew from the collection account all proceeds from the sale of the Notes except the $111,476 before Palmieri could submit a claim to Valley Bank for 50% of the $14 million profit. Palmieri promptly and emphatically communicated to Nugget its claim that the Fund was entitled to 50% of all proceeds in excess of Nugget's 20% minimum return under Paragraphs 2 and 4 of the Contract. Nugget took the position that the Contract did not provide for equal sharing of principal and interest in the event of prepayment of the Notes and refused payment.

The Fund filed suit against Nugget and Turner on April 9, 1985. In its complaint the Fund alleged that Nugget represented to the Fund that the Contract included sharing of principal and interest in the event of prepayment of the Notes. Accordingly, the Fund asserted claims for breach of contract for failure to pay to the Fund 50% of the prepayment principal purportedly due under the contract, breach of the covenant of good faith and fair dealing and fraud for Nugget's misrepresentation of the term providing for prepayment sharing and subsequent renunciation of such term, equitable relief in the form of reformation or rescission and restitution (arising from mistake or breach of fiduciary duty), unjust enrichment and the imposition of a constructive trust.

After restating its claims in an Amended Complaint, the Fund filed a Second Amended Complaint ("Complaint") on October 25, 1985. In this Complaint the Fund added claims against Nugget for violation of RICO, 18 U.S.C. § 1962(b), and introduced claims against Palmieri for breach of its contract with Morgan Stanley, negligence and breach of its fiduciary duty under ERISA, 29 U.S.C. § 1104(a)(1). The Fund alleged Palmieri breached its ERISA duty by failing to ensure that the Contract clearly set forth that Nugget agreed to share with the Fund 50% of interest and principal above the minimum return in the event the Notes were prepaid. Nugget filed a counterclaim against the Fund for attorney's

fees pursuant to an attorney's fees provision in the November 7, 1984 agreement. Palmieri asserted a cross-claim against Nugget for indemnity, contribution and declaratory relief. The Court dismissed the Fund's common counts, RICO claims and Palmieri's cross-claim before trial.

Prior to trial, the Court determined that the Contract was ambiguous and, consequently, permitted the parties at trial to introduce extrinsic evidence of its meaning with regard to sharing in the event of prepayment of the Notes. The Fund and Palmieri introduced a significant amount of evidence which supported their common position that Nugget did agree to share equally with the Fund its profits above the 20% minimum return in the event the Notes were prepaid. Such evidence included Palmieri employees' interpretation of the written Contract itself, statements made by Nugget to Palmieri during negotiations, Palmieri employees' contemporaneous notes of such conversations, and various memorandum reports made by Palmieri to Morgan Stanley at the time the Contract was signed, and during the interval between execution of the Contract and prepayment of the Notes. Moreover, the Fund and Palmieri introduced evidence that Turner, and Nugget's President and CEO, Stephen A. Wynn, made statements during this interval to third parties—including a reporter who published the statements in various newspaper and magazine articles—which were consistent with an agreement to share equally with the Fund in the event of prepayment. Turner and Wynn denied having made such statements.

At the close of the Fund's case in chief, it introduced an oral stipulation made between the Fund and Nugget that the amount of contract damages representing one half of Nugget's prepayment profits above the minimum return was $6,936,601.50. That is, the Fund and Nugget agreed that if the jury determined that Nugget breached the Contract by failing to share in prepayment, the amount owing to the Fund would be $6,936,601.50. This amount was supported by trial testimony of Gordon S. Gray, a Managing Partner of

Morgan Stanley, and Exhibit 723–A, previously admitted into evidence.

In the Fund's claims against Palmieri, it charged that Palmieri was negligent, breached its contract with Morgan Stanley and violated its fiduciary duties under ERISA by failing to make an agreement which clearly set forth the term for sharing in the event of prepayment. The Fund also advanced the theory that Palmieri violated such duties by failing to retain a security interest in the Notes. Palmieri consented to the collection account at Valley Bank by which Nugget could unilaterally withdraw the proceeds of prepayment, as occurred on or about February 28, 1985.

Palmieri averred that the Contract did include sharing in the event of prepayment. Hence, the imposition of liability against Nugget for breach of contract and award of 50% of Nugget's prepayment profit in excess of the 20% minimum return would exonerate Palmieri and make the Fund whole. Alternatively, Palmieri claimed that even if the Contract did not provide for prepayment sharing, the company did not violate its ERISA duties. Palmieri argued that because of the devaluation of the Notes, which resulted from Trans–Sterling's problems with the IRS and Nevada Gaming Commission, the Fund received a fair market price for the Notes without the contingency for prepayment sharing. Had Nugget not agreed to share in the event of prepayment, Palmieri would have proceeded to sell the Notes to Nugget at the $58.6 million price because of the unavailability of other buyers and Morgan Stanley's policy that the Notes be sold expeditiously. Both the Fund and Palmieri introduced evidence as to the value of the Notes prior to and on or about the October 31, 1984 date of their sale to Golden Nugget.

After the close of trial, the Court granted Nugget's motion for a directed verdict and dismissed the Fund's claims for fraud and breach of the covenant of good faith and fair dealing, finding that there was insufficient evidence in support of these claims to submit them to the jury. Similarly, the Court directed a verdict for defendant Turner on the Fund's causes of action against him individually, for fraud and breach of fiduciary duty.[6] In addition, the Court, *sua sponte*, directed a verdict and dismissed the Fund's state law claims against Palmieri for breach of contract and negligence because they were preempted by ERISA. 29 U.S.C. § 1144(a).

On July 21, 1988, the Court instructed the jury and submitted to it the Fund's claims for breach of contract against Nugget and violation of ERISA against Palmieri. The Court reserved for its decision the Fund's equitable claims against Nugget and Nugget's counterclaim for attorney's fees.

On July 22, the jury stated by Jury Note Number 1, dated 2:30 p.m., that it had reached a unanimous verdict. After the parties and their respective counsel were summoned, the Court convened at approximately 3:45 p.m. and the jury rendered its verdicts. On the contract claim the jury found for the Fund and against Nugget and assessed damages in the sum of "the maximum amount allowable by law as stated in court instructions # 44 & # 45." Instruction number 44 states, in pertinent part, "The measure of damages for [Nugget's breach of contract], if you so find, is the detriment caused by the breach of an obligation to pay money, which detriment is deemed by law to be the amount due by the terms of the obligation, with interest thereon." Instruction number 45 provides that the legal rate of interest in California is 7%. On the ERISA claim, the jury found in favor of defendant Palmieri and against the Fund and, accordingly, assessed no damages.

With regard to the contract claim against Nugget, the Court instructed the jury to reconsider its verdict and to reach a verdict which included a specific dollar amount. The jury then retired to the jury room at about 3:55 p.m. At approximately 4:20 p.m. the jury returned to render a second

---

**6.** The Fund's Fourth and Fifth Causes of Action alleged fraud and breach of fiduciary duty against Nugget and Turner. The fourth claim prayed for damages; the fifth for rescission, restitution and exemplary damages.

verdict on the contract claim against Nugget, at which time the first was stricken by the Court. In its second verdict, the jury assessed damages for the Fund against the Nugget on the contract claim "in the sum of $6,874,559.00 plus 7% in prejudgement (sic) interest, per annum, from ·2/28/85." This verdict and the verdict in ·favor of Palmieri on the Fund's ERISA claim were then duly filed, on July 22, 1988, and judgments were entered on the verdicts on July 25.

On July 26, the Court held a hearing to announce its findings on the Fund's equitable claims against Nugget. The Court granted judgment in favor of Nugget and dismissed both the Fund's reformation and rescission claims. In addition, the· Court amended the judgment on the contract claim to include the amount of prejudgment interest designated by the jury verdict and judgment, which provided for 7% interest on the contract damages of $6,874,559.00 from February 28, 1985. The Court found the amount of prejudgment interest to be $1,637,463.43, for a total judgment on the verdict against Nugget of $8,512,022.43. A written order so amending the judgment entered July 25 on the contract claim was filed August 10, 1988 and entered on August 15.

On July 29, 1988, the Fund filed an application to amend the judgment on the contract claim against Nugget. In this motion, the Fund asserts that the jury reached the verdict of $6,874,559.00 by innocent and unintentional mistake, because the stipulated amount of contract damages was the higher figure of $6,936,601.50, and in its first, stricken verdict, the jury stated its intention to award the maximum amount of contract damages available by law. On August 4, the Fund filed a motion to amend or alter the judgment in favor of Palmieri on the Fund's ERISA claim. The Fund in this motion charges that the Court, not the jury, should have determined the Fund's claim that Palmieri violated its ERISA duties. Moreover, the Court should find in favor of the Fund on this claim and assess damages. The Fund also moves for an award of attorney's fees and costs against Nugget, and Palmieri moves for attorney's fees and costs against the Fund.

## DISCUSSION

### A. The Fund's Motion to Amend the Judgment of Damages Against Golden Nugget

The Fund moves the Court to amend the judgment on contract damages against Nugget to increase the principal award from $6,874,559.00 to $6,936,601.50, and to award prejudgment interest on the greater amount. This motion is premised upon two interrelated factors. First, the Fund argues that the jury's verdict of $6,874,559.00 was an unintended and inadvertent mistake. This is assertedly true in light of two facts: a) the Fund and Nugget stipulated to the higher figure of $6,936,601.50, and b) ·the jury's first verdict on the contract claim, later stricken by the Court, stated expressly that it wished to award the maximum amount of damages permissible by law against Nugget on this claim. The Fund points out that the figure of $6,874,559.00 was contained at the bottom of Exhibit 394–A. In the roughly half-hour time period in which the jury converted its verdict for "the maximum amount" to the specific figure of $6,874,559.00, it adopted this amount rather ·than the stipulated amount listed in Exhibit 723–A. Second, the Fund avers that the Court has the power to so amend the judgment, to impose damages in an amount different than that returned by the jury, under Fed.R.Civ.P. 59(e), and relevant case. law, *Mumma v. Reading Co.*, 247 F.Supp. 252 (E.D.Pa. 1965); *Rodgers v. Conemaugh & Black Lick Railroad Co.*, 137 F.Supp. 467 (W.D. Pa.1956); *Bauman v. Choctaw–Chickasaw Nations*, 333 F.2d 785 (10th Cir.1964).

In opposition, Golden Nugget makes three arguments. First, it asserts that the *Mumma, Rodgers* and *Bauman* cases, *supra*, do not support the Fund's contention that a court may utilize Rule 59(e) to modify a judgment so as to alter the amount of damages awarded in a jury verdict. Second, Nugget claims the oral stipulation that the amount of contract damages would be $6,936,601.50 was not properly presented to the jury in the Fund's case-in-

chief. Lastly, Nugget claims that the Fund waived its objection to the lower verdict of $6,874,559.00 by its failure to request a jury instruction as to the stipulated figure or bring to the Court's attention the stipulated figure at the time the jury returned its first verdict for "the maximum amount available by law...." Nugget cites *Arkla Exploration Co. v. Boren*, 411 F.2d 879 (8th Cir.1969) and *McCarthy v. Manson*, 714 F.2d 234 (2d Cir.1983) in support of this waiver argument.

For a Court to amend a judgment so as to set aside a jury verdict and substitute its own finding of the proper amount of damages, it must first identify the source of its power to do so. Preliminarily, this Court is extremely reluctant under Rule 59(e) to disregard a jury verdict and substitute its own judgment as to the proper amount of damages which should be awarded, and should do so only in extraordinary circumstances. The question presented is not one in the nature of remittitur, to reduce an amount of damages but, because the Fund seeks an amount greater than the judgment entered on the jury verdict, is the functional equivalent of an additur motion —unavailable in Federal court, *Dimick v. Schiedt*, 293 U.S. 474, 486–88, 55 S.Ct. 296, 300–301, 79 L.Ed. 603 (1935).

Fed.R.Civ.P. 59(e) states, "A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment." While this rule itself provides little guidance, the case law is equally unhelpful. The cases cited by the Fund do not consider the situation presented here —a jury's asserted mistake in reaching a damages award, inconsistent with a prior statement of intent to award a maximum permissible amount of damages, and different from the higher, stipulated amount between the parties. In *Mumma v. Reading Co.*, 247 F.Supp. 252, 259–260 (E.D.Pa. 1965) and *Rodgers v. Conemaugh & Black Lick Railroad Co.*, 137 F.Supp. 467, 470 (W.D.Pa.1956), the respective courts amended judgments in accordance with their decisions to set aside findings of contributory negligence on the part of the plaintiffs. In *Bauman v. Choctaw–Chickasaw Nations*, 333 F.2d 785, 789–90 (10th

Cir.1964), the Court of Appeals held that the District Court, after a *non-jury trial*, erred by not finding a certain tract of land was owned by the appellant pursuant to a stipulation between the parties.

█ ·Alternatively, Nugget has not presented authority foreclosing the relief requested under Rule 59(e); nor is the Court aware of any cases which have held that a District Court lacks the power to amend a judgment entered on a verdict in order to conform the judgment to the perceived true intent of the jury, in conjunction with a stipulation. Therefore, the Court holds that it does possess the power under Rule 59(e) to amend the judgment if the facts of this case and the interests of justice so warrant. If the Court, after considering the stipulated damages amount of $6,936,601.50, together with the jury's first verdict awarding the "maximum amount allowable," finds that the jury must have made an honest and inadvertent mistake by reaching a verdict of $6,874,-559.00, the Court may amend the judgment to comport with the jury's express intentions.

The parties stipulated orally during trial on June 28, 1988 to the figure $6,936,-601.50, referred to by the Fund's counsel in Exhibit 723–A, and presented this amount to the jury on that date as the proper amount of contract damages available against Nugget. The jury's first verdict stated its intent to award "the maximum amount allowable by law as stated in court instructions # 44 & # 45." The Court instructed the jury to retire to the jury room to reconsider its verdict and return with a verdict which included a specific dollar amount. The jury did so in less than one half hour, although it had for consideration several hundred document exhibits, admitted into evidence and taken to the jury room, from which to determine a specific dollar amount.

The jury returned a second verdict of $6,874,559.00, an amount contained on the bottom of Exhibit 394–A, next to the description "Amount due to the Fund." This document was a calculation made by Allan

Lipsky, an employee of Palmieri, after learning that Nugget intended to share only excess interest after the Notes were prepaid. This figure was not adopted or sponsored by either the plaintiffs or defendants as the correct sum owed to the Fund on prepayment. Moreover, the $6,874,559.00 figure is different than the stipulated amount of $6,936,601.50 in Exhibit 723–A and, because less that the stipulated amount, it is inconsistent with the jury's stated intent in its first verdict to award in contract damages against Nugget "the maximum amount available by law." The combination of these factors leads the Court to the inescapable conclusion that the jury, in its apparent desire to make an expedient quantification of its prior verdict awarding the "maximum amount" of damages, mistakenly determined Exhibit 394–A, rather than Exhibit 723–A, contained the correct amount of contract damages. The Nugget makes no argument to the contrary. Accordingly, the Court finds that the jury's verdict of $6,874,559.00 in contract damages against Nugget was reached in error.

The Court also finds Nugget's remaining arguments to be unpersuasive. Nugget claims the jury was free to disregard the stipulated amount because it was not properly presented to the jury. However, Nugget's opposition papers quote only a portion of the record in this respect. The following colloquy of June 28, 1988 between the Court, the Fund's counsel (Mr. Smaltz) and Nugget's counsel (Mr. Kuh), in the presence of the jury, provides the complete picture:

> Mr. Smaltz: Judge, in view of the stipulation, we reached off the record, we now rest.
>
> . . . . .
>
> The Court: In view of what situation (sic)?

> Mr. Smaltz: The stipulation that we discussed.
>
> The Court: Thank you. Which is?
>
> Mr. Smaltz: That particular document, 723–A, is in evidence.
>
> The Court: All right.
>
> Mr. Smaltz: And that number—the number of $6,936,601.50, which is the balance—is in evidence.
>
> Mr. Kuh: No problem, your honor.
>
> The Court: Well, no problem. That is the money that the plaintiff claims, as I understand it. And everybody stipulates to that.
>
> All right. Plaintiff rests.
>
> Mr. Smaltz: Yes, sir.

Reporter's Transcript at 6100.

Thus, the stipulation itself, the amount of contract damages to which the Fund and Nugget had agreed, and the correct exhibit number in which that sum was contained, were presented to the jury by the Fund. Nugget's argument to the contrary is without merit.

▪ Finally, Nugget's waiver argument is unavailing. The Fund did not propose a jury instruction stating the stipulated amount of contract damages or refer to the stipulated amount after the jury returned either of its verdicts against Nugget. Yet the Fund filed its formal motion, titled "Application to Amend Judgment," on July 29, 1988, just four days after judgment was entered on the second verdict against Nugget on July 25. The motion complies not only with the 10–day requirement of Rule 59(e), *supra,* but appears otherwise to have been filed in a reasonably timely fashion in light of all the circumstances of this case.[7]

For the foregoing reasons and in the interests of justice, the Court finds that the extraordinary circumstances of this case provide ample grounds for granting the relief requested by the Fund under Rule

---

7. The cases cited by Nugget to the contrary, *Arkla Exploration Co. v. Boren,* 411 F.2d 879 (8th Cir.1969), and *McCarthy v. Manson,* 714 F.2d 234 (2d Cir.1983), are inapposite. In *Arkla,* the Court of Appeals affirmed the District Court's denial of a Rule 59(e) motion to amend the judgment for damages, to include prejudgment interest, where the plaintiff had not requested prejudgment interest in its proposed jury instructions. 411 F.2d at 883–84. In *McCarthy,* the court held that the state's failure to object to a magistrate's recommended decision in a habeas corpus case constituted a waiver to collateral relief under Rule 59(e). 714 F.2d at 237–38.

59(e). The Fund's application to amend the judgment is hereby granted. The judgment shall be amended to reflect the true intent of the jury to award contract damages in favor of the Fund and against Golden Nugget in the amount of $6,936,601.50, plus prejudgment interest from February 28, 1985 to July 25, 1988. Prejudgment interest for this time period is $1,652,241.44. Therefore, under the amended judgment, the total damages to be awarded on the Fund's contract claim against Nugget shall be $8,588,842.94.

## B. *The Fund's Motion to Amend the Judgment on its ERISA Claim Against Palmieri*

The Fund moves the Court under Rule 59(e), *supra*, to "Amend or Alter the Judgment" on its ERISA claim against Palmieri to find Palmieri liable to the Fund in the amount of $3,064,548.05, contrary to the jury's finding of no liability on this claim. The Fund first submits that the Court stated during trial that it, not the jury, would determine whether Palmieri violated ERISA and caused damage to the Fund. Next, the Fund asserts that the Court erred by submitting the ERISA claim to the jury under recent cases in this circuit. *See Nevill v. Shell Oil Co.*, 835 F.2d 209 (9th Cir.1987); *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). As in its motion to amend the judgment of contract damages against Nugget, the Fund contends that Rule 59(e) provides the Court with the power to amend the judgment on the ERISA claim.

Finally, the Fund charges that a preponderance of the evidence compels the Court to find Palmieri breached its ERISA duties, 29 U.S.C. § 1104(a)(1),[8] and the breach resulted in damages to the Fund in the amount of $3,064,548.05. The Fund cites in support of Palmieri's liability trial testimony of Julian Burke, Palmieri's Executive Vice-President and signatory to the Contract for sale of the Trans-Sterling Notes. The testimony purports to be Burke's admissions that: a) in violation of the duty of a prudent investment manager, Palmieri signed the Contract for the sale of the Notes, which was ambiguous as to sharing in the event of prepayment, and b) Palmieri's failure to retain a security interest in the Notes or insist on double signatures in the collection account at Valley Bank allowed Nugget to withdraw unilaterally the disputed Funds from the collection account.

The Court instructed the jury that lost investment profits were an available measure of damages on the ERISA claim, 29 U.S.C. 1109(a), *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir.1985). In its breach of contract claim, the Fund could recover only 7% prejudgment interest against Golden Nugget. The Fund introduced testimony that during the period in controversy, it earned a compounded rate of approximately 16.8% per annum on its investments. Hence, if both Nugget and Palmieri were found to be liable to the Fund, Palmieri's liability would be the amount of interest on the contract damages in excess of the 7% statutory rate available against Nugget up to a maximum of 16.8%—the difference in the two rates applied to the amount of contract damages. The Fund contends that this amount of approximately 9.8% of the stipulated contract damages amount of $6,939,601.50 is $3,064,548.05.

Palmieri opposes the motion on several theories. First, it contends that the Court properly submitted the ERISA claim to the jury, and was not precluded by the *Nevill* and *Blau* cases, *supra*. Alternatively, the Fund manifested its consent to have the jury decide the ERISA claim and waived the objection it now raises. Next, Palmieri submits that Rule 59(e) does not give the Court power to, in effect, reverse a jury verdict. Rather, the Fund is assertedly making a disguised motion for a judgment

---

**8.** Section 1104(a)(1) states in part:

(1) . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . .

notwithstanding the verdict ("JNOV"), Fed. R.Civ.P. 50(b), without having made the required motion for a directed verdict at the close of evidence. *Id.* Finally, Palmieri submits that even if the Court could properly revisit the ERISA claim, the record supports the finding that Palmieri did not violate ERISA with regard to the Contract for sale of the Trans–Sterling Notes or, if it did, the Fund suffered no damage because of the breach.

■ Again, the Court must first establish that it has the power to grant the Fund's extraordinary request to amend the judgment on the ERISA claim in its favor notwithstanding a contrary jury verdict. The Fund relies on Rule 59(e) and, as above, the language of the rule provides little assistance. The Fund cites two cases in support, *White v. New Hampshire Department of Employment Security,* 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982), and *Miller v. Transamerican Press, Inc.,* 709 F.2d 524, 527 (9th Cir.1983). However, neither case concerned a Court's implementation of Rule 59(e) to amend a judgment contrary to a jury verdict. The *White* case involved a post-judgment motion for attorney's fees, while *Miller* involved an order denying a motion to compel deposition testimony. In contrast, many courts have discussed the importance of the Rule 50(b) requirement that a directed verdict motion must preceed a motion for JNOV, *e.g., Lifshitz v. Walter Drake & Sons, Inc.,* 806 F.2d 1426, 1429 (9th Cir. 1986), and the concommitant impropriety of the use of Rule 59(e) to undermine a jury's fact-finding role, *see Abeshouse v. Ultragraphics, Inc.,* 754 F.2d 467, 473 (2d Cir. 1985); *Robinson v. Watts Detective Agency,* 685 F.2d 729, 742 (1st Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983). To hold otherwise would convolute Rule 59(e) into a procedural artifice which would make jury verdicts meaningless and judgments nullities. Consequently, the Court has no power under Rule 59(e) to reconsider the merits of the Fund's ERISA claim against Palmieri, decided in favor of Palmieri by the jury.

Fundamentally, the Fund's position is that an ERISA claim can never be determined by a jury, but must always be decided by the trial judge. The ERISA statute itself is silent on the issue of a private plaintiff's right to a jury trial. 29 U.S.C. § 1132. In *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1357 (9th Cir.1985), this circuit stated that there is no statutory or constitutional right to a jury trial in ERISA cases. In *Blau,* the Court of Appeals affirmed the District Court's refusal to submit an ERISA claim to a jury where the plaintiff had failed to make a timely jury trial demand. The appellate court applied an abuse of discretion standard and held that the trial court's denial of a jury trial in light of the untimeliness of the jury trial demand, coupled with the lack of any right to a jury trial on an ERISA claim, did not constitute an abuse of discretion. Id. In *Nevill v. Shell Oil Co.,* 835 F.2d 209 (9th Cir.1987), the Court of Appeals again affirmed the trial court's denial of a jury trial on the plaintiff's ERISA claim. The appellate court repeated that there is no statutory or constitutional right to a jury trial under ERISA, citing *Blau, supra.* With little discussion, the court held that in light of *Blau,* the trial court's denial of a jury trial on the ERISA claim was not an abuse of discretion. *Nevill,* 835 F.2d at 212–13.

■ Although *Blau* and *Nevill* set forth the settled law in this circuit that there exists no statutory or constitutional right to a jury trial of an ERISA claim, these cases are not dispositive. First, while they state that a plaintiff has no *right* to a jury trial on an ERISA claim, they reject by implication the argument that the Fund makes here—that an ERISA claim may never be properly submitted to a jury. Nether case begins to fashion such a rule explicity. Rather, implementation of an abuse of discretion standard for determining the propriety of the denial of a jury trial demand for an ERISA claim in both *Blau* and *Nevill* indicates that a trial court may, by consent of the parties, or even by fiat of the trial court (Fed.R.Civ.P. 39(b); *Blau, supra,* 748 F.2d at 1357), exercise its discretion in favor of submitting an ERISA claim to a jury. That is to say, when the

Court of Appeals held the trial courts in *Blau* and *Nevill* did not abuse their discretion by denying plaintiffs' jury trial demands, the court implicitly recognized the trial courts' option to grant the demands and submit the ERISA claim in each case to the jury. By application of fundamental rules of logic, the Fund's rigid position fails; the denial of a right to pursue a certain procedure does not preclude the permissive use of the procedure.

In addition, Fed.R.Civ.P. 39(c) provides in pertinent part, "In all actions not triable of right by a jury ... the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right." As discussed *infra*, both the Fund and Palmieri consented to have the ERISA claim decided by the jury. Hence, under Rule 39(c), the Court, with the consent of the parties, properly submitted the Fund's ERISA claim to the jury notwithstanding the fact that absent such consent, the Court was not compelled to do so under *Blau* and *Nevill, supra. See, e.g., Whiting v. Jackson State University*, 616 F.2d 116, 123 (5th Cir.1980). Accordingly, the Court did not err in submitting the Fund's ERISA claim to the jury by consent of the parties.

The Fund contends, however, that the Court's own error and reversal of its prior ruling supports this motion. On the fourth day of trial, May 13, 1988, the Court, during argument outside the presence of the jury, stated that it would decide the Fund's ERISA claim, and not submit it to the jury. Reporter's Transcript at 573–78. The Court made these statements during a discussion of whether ERISA preempted the Fund's state law claims against Palmieri for breach of contract and negligence. Yet, further excerpts from the record indicate that despite its earlier pronouncements, the Court had not made a definitive and unequivocal ruling on this point, as indicated by this dialogue between the Court and counsel for Palmieri (Mr. Sharer):

Mr. Sharer: ... I want to say in response to what Mr. Smaltz said, the one thing I don't want to see happen and the one thing that I believed in light of the stipulated pretrial order and the signature would not happen is I don't want to see happen that I try this case to the jury and get a defense verdict from the jury and then have Mr. Smaltz assert that despite the defense verdict the Court can nonetheless look at the ERISA and—

The Court: Not to worry.

Mr. Sharer: Not to worry? Very well, your honor.

The Court: Because if he gets a verdict, he's not going to get double damages. If he you (sic) get the verdict, he gets nothing.

Mr. Sharer: But if I get a defense verdict completely and let's assume Mr. Kuh gets a defense verdict as well, or does not, under those circumstances if we assume the jury comes in with a total defense verdict, I don't want to see Mr. Smaltz urging the Court should then consider ERISA.

The Court: That is why you are going to get a chance for opposition to his motion and then put in your own thoughts and I'll look it all over.

Mr. Sharer: Very well.

Reporter's Transcript at 581–82.

The Court invited the parties to file legal memoranda on the questions of whether ERISA preempted the state claims and whether the ERISA claim could properly be submitted to the jury. The parties did not, however, submit papers on these issues, and the Court determined, *sua sponte*, and only after the close of all evidence, that ERISA did preempt the Fund's state law claims against Palmieri. Therefore, The Fund's position receives paltry, if any, support based on the Court's statements that the ERISA claim would not be submitted to the jury.

■ Palmieri next urges that even if the Fund's ERISA claim should not have been submitted to the jury, the Fund consented to the procedure and waived any objection thereto. In support of this argument, Palmieri submits a list of instances in which the Fund either manifested its assent for the jury to determine its ERISA claim or

was silent on the point when a timely objection could and should have been raised. These include the Fund's memorandum of contentions of fact and law pursuant to Local Rule 9; the Pre–Trial Conference Order; colloquy with the Court on May 13, *supra;* the Fund's proposed jury instructions, which included instructions pertaining solely to the ERISA claim; the Fund's proposed special interrogatories for the jury, which contained interrogatories directed specifically to the ERISA claim; the Fund's failure to object at the time the Court directed a verdict for Palmieri on the Fund's state law claims and announced the ERISA claim would be submitted to the jury; and throughout hearings on jury instructions.

The Fund responds that it at no time consented to have the Court submit the ERISA claim to the jury. It relied on the Court's statements that the ERISA issue would be reserved for determination by the Court. And, until the Court dismissed the state claims against Palmieri as preempted, the Court did not indicate it would submit the ERISA claim to the jury and gave the Fund no opportunity to object.

The record belies these arguments. The pre-trial pleadings are entirely consistent with the Fund's manifold and manifest assents to the jury's determination of the ERISA claim against Palmieri. The colloquy on May 13, as quoted here, is equivocal on the question of whether the ERISA claim would be decided by the Court or the jury. In light of the apparent uncertainty in the record, the Fund was obligated to more assertively state its position that the ERISA claim be decided by the Court. Moreover, the Fund's claim that it relied on the Court's statements on May 13—that ERISA would not go to the jury—is inconsistent with the Fund's *subsequent* submission of jury instructions on its ERISA claim. Finally, in stark contrast to the many instances in which the Fund expressed its agreement that the jury should decide the ERISA claim, the Fund did not state any objection to this procedure at any time between the Court's announced decision to direct a verdict on the state claims and submit the ERISA claim to the jury—

on July 14, 1988—and the Court's submission of the claim to the jury—on July 21—despite ample opportunity to do so. Therefore, the Court finds that even if the ERISA claim was improperly submitted to the jury, the Fund consented to the procedure and waived any objection by its failure to timely state its objection prior to the submission of this claim to the jury.

Finally, even if the Court erred by submitting the Fund's ERISA claim to the jury and could amend the judgment under Rule 59(e) to impose liability on Palmieri, the evidence weighs preponderantly to the contrary. The Fund argues that Palmieri violated its fiduciary to duty to the Fund—not acting with the requisite care, skill, prudence, and diligence required of ERISA fiduciaries, 29 U.S.C. § 1104(a)(1)—in two ways.

First, Palmieri allegedly had a duty to set forth its agreement for sale of the Notes in a clear and unambiguous manner. The Fund contends that this duty was breached in light of the ruling of the Court and testimony of Palmieri's Julian Burke—signatory of the Contract on behalf of the Fund—that the Contract was ambiguous on the question of whether Nugget would share principal and interest with the Fund in the event the Notes were prepaid.

Second, because the Contract provided that the Fund would share in payments on the Notes upon the occurrence of other contingencies explicitly stated in the Contract, Palmieri had a duty to adequately protect such contingent interests. The Fund cites testimony of Burke that the Fund gave up "significant protection" by permitting Nugget to maintain possession of the Notes without Palmieri's retention of a security interest in them. The Fund contends that "adequate protection" would have included Palmieri's retention of a security interest or joint control of the Notes, or the requirement of double signatures—Nugget's and Palmieri's—for withdrawals of funds from the collection account at Valley Bank.

Third, the Fund asserts that the amount of damages caused by Palmieri to the Fund is the amount of $3,064,548.05. Although damages for the full amount of the Fund's half-share of prepayment profits were assessed against Nugget, the Fund contends that it can only be made completely whole if it is awarded the total amount that would have been generated had that half-share been invested by the Fund in accordance with the Fund's investment practices. The Court instructed the jury that it could award against Palmieri the Fund's lost investment profits on the amount of compensatory damages caused by Palmieri's breach. The Fund introduced evidence its lost investment profits were 16.8%. The Court limited interest on the contract claim against Nugget to the statutory prejudgment interest rate of 7%. Cal. Const. Art. XV, § 1; Cal.Civ.Code § 3302. Thus, the Fund seeks an amount of damages against Palmieri which is approximatedly 9.8% of the contract damages amount of $6,936,-601.50, *supra*, assertedly $3,064,548.05.

Palmieri first responds that the evidence viewed as a whole supports the conclusion that Palmieri did not breach its fiduciary duties under ERISA, with regard to either the clarity of the Contract on prepayment sharing or Palmieri's agreement to the single-signature loan collection account. Second, Palmieri states in a two-pronged argument that, whether Palmieri violated ERISA or not, the Fund suffered no harm because of Palmieri's actions with respect to sale of the Notes. Because the jury found Nugget breached the Contract and awarded the Fund damages plus interest, Palmieri did not violate ERISA inasmuch as the jury determined the Contract did include sharing in the event of prepayment. Nor, Palmieri contends, was the additional "lost profits" income of 16.8% sufficiently proven at trial. Alternatively, Palmieri contends that even if the jury had returned a verdict for Golden Nugget—thereby implying that the Contract did not include sharing in the event of prepayment—then Palmieri made the only deal to which Nugget or any other of the limited number of buyers would have agreed. Consequently, Palmieri did not breach its ERISA duties by failing to make an agreement for sale of the Notes with sharing in the event of prepayment because neither Nugget nor other buyers with which Palmieri had been negotiating would have agreed to such a provision.

■ After consideration of the record as a whole the Court finds, as did the jury, that Palmieri did not breach its fiduciary duties under ERISA. The Fund's scanty and incomplete excerpts drawn from fourteen days of Burke's trial testimony cannot be found by any reasonable trier of fact to satisfy the onerous burden of the Fund's request that the Court, in effect, reverse the jury verdict. Burke testified that his position was that the Contract *did* sufficiently set forth the agreement to share in the event of prepayment, and that use of the term "prepayment" itself was not necessary. This view was shared by the Fund's named fiduciary, Morgan Stanley, as stated in testimony by Lynn Thurber, who monitored and served as Morgan Stanley's liaison to Palmieri. The Fund itself, throughout the pendency of the case asserted that the Contract included sharing in the event of prepayment. Evidence of Nugget employees' statements, including those made by Wynn and Turner to independent third parties, conceded such. And the jury so agreed. The fact that the Fund was compelled to bring suit to enforce the agreement does not, *ipso facto*, prove Palmieri's breach of its fidiciary duties under ERISA. There is certainly no guaranty that, had the Contract been drafted in a more precise manner, this dispute would not have arisen.

■ Nor can the Court conclude that Palmieri's agreement to the note collection account at Valley Bank constituted a breach of its fiduciary duties under ERISA. Burke testified that the issue first arose at the November 7, 1984 closing on the Contract. Although the Fund had expected to retain possession of the Notes, Nugget refused to close the deal unless the Fund surrendered possession. The decision to set up the note collection account was a compromise made between the parties in an effort to prevent this dispute from thwarting consummation of the Contract for Nug-

get's purchase of the Notes. The Fund presented no testimony, by Morgan Stanley or others, that the collection account mechanism was unsatisfactory. In consideration of this evidence, the Court should not second-guess Palmieri's decision to agree to the collection account and speculate as to not only what would have been a better procedure but also as to what arrangement Nugget would have agreed to. Palmieri was not required to make the very best deal it could, but just a prudent one, in light of all the circumstances of the case. In particular, Palmieri's long and unsuccessful efforts to sell the Notes, coupled with Morgan Stanley's investment policy for their expedient sale, must provide some guidance as to what was reasonably prudent on November 7, 1984. In sum, the Court finds that Palmieri's agreement to the note collection account did not constitute a violation of its fiduciary duties under ERISA.[9]

For all of the foregoing reasons, the Fund's motion to amend or alter the judgment, in order to impose liability and damages against Palmieri under ERISA, is hereby denied.

## C. *The Fund's Motion for Attorney's Fees and Costs Against Golden Nugget*

As previously stated, the Fund will be awarded judgment against Golden Nugget in the total amount of $8,588,842.94 on its claim for breach of contract. The Fund now applies for attorney's fees and costs in the amounts of $2,000,247.00 and $287,-081.82, respectively, pursuant to a provision in the agreement executed at the closing of the sale of the Notes on November 7, 1984. Nugget opposes the Fund's entitlement to fees and costs, and also objects to the specific amounts requested.

### 1. *Entitlement to Attorney's Fees*

Paragraph 8 of the November 7 Agreement, signed by Clyde T. Turner, on behalf of Nugget, and Julian Burke, for Palmieri, states:

> *Attorney's Fees.* In the event legal proceedings are commenced to enforce or declare the rights or obligations of either party hereunder, or under the October 31, 1984 Agreement, the prevailing party in such legal proceedings shall be entitled to an award of reasonable attorney's fees and costs of suit.

Nugget submits that the Fund is not the "prevailing party" in this action because the Fund prevailed against Nugget on only one of eleven claims, the other ten having been dismissed before trial (common counts and RICO claims), during trial (directed verdict on breach of the covenant of good faith and fair dealing and fraud claims) or decided in favor of Nugget and against the Fund by the Court (equitable claims for reformation and rescission). Nugget also argues that the Fund is not the "prevailing party" because the Fund's recovery of more than $8.5 million is too small a percentage of the total recovery sought by the Fund in its Second Amended Complaint. In support of this position, Nugget cites two California cases, *Kytasty v. Godwin,* 102 Cal.App.3d 762, 162 Cal.Rptr. 556 (1980), and *Nasser v. Superior Court,* 156 Cal.App.3d 52, 202 Cal.Rptr. 552 (1984). Nugget also contends that the attorney's fees provision in the November 7, 1984 agreement pertained only to the written agreements between the parties. In Nugget's view, the jury was instructed as to both written and oral contracts between itself and Palmieri, on behalf of the Fund, and returned a general verdict which, Nugget argues, may have been based on an implicit finding that Nugget breached an oral contract rather than the October 31, 1988 written contract.

Since this is a diversity case, recovery of attorney's fees is determined under state law. *Diamond v. John Martin Co.,* 753 F.2d 1465, 1467 (9th Cir.1985). Here we are governed by California law, which permits a prevailing party to a contract con-

---

**9.** Finding no liability against Palmieri under ERISA, the Court need not address the issue of damages.

taining a clause for an award of attorney's fees and costs to the prevailing party in a dispute under the contract to recover such fees and costs. Cal.Civ.Code § 1717(a). *In re Sparkman*, 703 F.2d 1097, 1100 (9th Cir.1983). Paragraph 8 of the November 7, 1984 agreement is a paradigm of the type of clause contemplated by section 1717(a) and provides the basis for an award of fees to the Fund, if it is determined to be the prevailing party in this action.

■ Analysis of this issue must begin with the basic rule that to be deemed a prevailing party, the Fund need not have obtained all the relief sought in its Complaint against Golden Nugget. *E.g., Sparkman, supra,* 703 F.2d at 1100. In this action, the Fund sought in eleven causes of action against Nugget equitable relief, compensatory damages in excess of $18,000,000 and punitive damages in excess of $20,000,000. The Fund obtained a judgment for $8,588,842.94 in compensatory damages on its contract claim against Nugget; the remaining ten counts were disposed of in favor of Nugget before, during or after trial. Yet, the essence of the Fund's suit remaining against Nugget was a contract action—what were the terms of the October 31, 1984 contract? Did the parties agree that if the Notes were prepaid, Nugget was obligated to share equally with the Fund principal and interest in excess of the minimum return? The jury answered this last question in the affirmative and awarded the maximum amount of damages available for the contract claim,[10] in excess of $8.5 million.

The Court rejects Nugget's position that a party who recovers less than the total relief requested is not a "prevailing party" and, therefore, precluded from recovering attorney's fees. In *Kytasty v. Godwin,* 102 Cal.App.3d 762, 162 Cal.Rptr. 556, (1980), the Court of Appeal summarily denied an award of attorney's fees where certain defendants established at trial their

right to a 60–foot wide easement, but the width of which was ordered by the court to be narrowed on remand. Citing no authority, the court stated that it was unable to establish a prevailing party and could not "in good conscience" mandate an award of attorney's fees. *Id.* at 774, 162 Cal.Rptr. at 563.

In *Nasser v. Superior Court,* 156 Cal. App.3d 52, 202 Cal.Rptr. 552 (1984), the Court of Appeal denied a petition for a writ of mandate to compel the trial court to vacate its denial of attorney's fees where the petitioner lessee successfully obtained a judgment validating his lease in the trial court, but at a rental fee higher than that requested in the action. The appellate court held that under these facts the trial court did not abuse its discretion in finding that petitioner was not the prevailing party. *Id.* at 59–60, 202 Cal.Rptr. at 556. The court stated that the trial court " ' "is given wide discretion in determining which party has prevailed on its cause(s) of action." ' " *Id.* at 59, 202 Cal.Rptr. at 556 (quoting *Smith v. Krueger,* 150 Cal.App.3d 752, 756–57, 198 Cal.Rptr. 174, 176 (1983)).

As held in *Nasser,* the Court here has broad discretion to determine whether the Fund is the "prevailing party" in this case. Necessarily, trial courts must determine whether a party seeking attorney's fees is a prevailing party on a case by case basis. Neither *Kytasty* nor *Nasser* are factually similar to this action, or controlling. In both, the party seeking attorney's fees prevailed in what were, essentially, declaratory relief actions, but obtained relief less favorable than that sought. Here, the Fund obtained full recovery on its contract claim,[11] even though it received no recovery on its remaining claims against Nugget.

■ Nugget's argument that the jury may have found Nugget breached an oral contract—under which there exists no entitlement to attorney's fees—is equally unavailing, because it is clearly undercut

---

10. Although the Fund sought contract damages of approximately $6.9 million and lost investment profits of 16.8% on that sum, the Court in its jury instructions limited recovery to the contract damages and 7% prejudgment interest thereon. Thus, although the Fund recovered less than the total amount sought, it recovered the maximum amount legally available.

11. *But see* note 10, *supra.*

by the Court's instructions to the jury. It is true that the November 7, 1984 agreement providing for attorney's fees refers only to resolution of disputes under that written agreement and the October 31, 1984, written contract. But, Nugget is incorrect in its assertion that the jury instructions permitted the jury to find Nugget breached an oral contract. Nugget cites Instruction No. 39, which directed the jury to consider statements and conduct of the parties,[12] and Instruction No. 43, which directed the jury to determine the terms of the Contract from all the evidence in the case, not just the written agreement alone.[13]

Pursuant to the Court's ruling that the Contract was ambiguous, parole evidence was admitted to determine the terms of the *written* Contract, not to establish any separate or distinct oral agreements. This is made clear by a fair reading of the instructions. For example, Instruction No. 39 states, in relevant part, "To resolve the ambiguity you may consider the statements and actions of the persons who made and signed the letter agreement *in order to determine what they intended the written agreement to mean.*" (emphasis added). Instruction No. 41 states, in part, "You must consider *what [the parties] said and did when they made and signed the written agreement,* and determine what a reasonable person at that time would have understood to be the terms of the agreement." (emphasis added). Therefore, consistent with the Court's prior rulings, the jury was instructed only to determine the

terms of the October 31, 1984 written contract in light of parol evidence. The jury was not instructed that it could find the existence and breach by Nugget of a separate, oral agreement. Consequently, the jury verdict was a finding that Nugget breached the written contract, entitling the Fund to attorney's fees under the attorney's fees clause of the November 7, 1984 agreement.

In view of the Fund's full recovery on the contract claim, and since it seeks attorney's fees and costs only as incurred with respect to that claim and issues common thereto, *infra,* the Court finds that the Fund is the prevailing party in this action. Accordingly, the Fund should recover attorney's fees pursuant to the November 7, 1984 agreement in the amount determined below.

### 2. *Amount of Fees*

The Fund seeks $2,000,247 in fees, representing 9,278 hours of attorney time and 4,620.25 hours expended by paralegals. The amount of $68,854.50, included in the total amount of fees sought, is attributable to charges for law clerks, summer associates and litigation support personnel. In addition to the Fund's present counsel, Morgan, Lewis & Bockius, the law firms of Hughes, Hubbard and Reed; Smaltz & Neeley; and Hahn, Cazier & Smaltz represented the Fund during the pendency of this case. The Fund seeks fees for work performed by all four firms.

12. Instruction No. 39 provides:
 The Court has determined that the Letter Agreement, Exhibits 68 and 470, which is the subject of the Fund's breach of contract claim, is ambiguous. Therefore, it is for you to interpret the terms of the agreement as to that part which is ambiguous.
 To resolve the ambiguity you may consider the statements and actions of the persons who made and signed the letter agreement in order to determine what they intended the written agreement to mean. The statements and conduct of the persons involved in the negotiation of the written agreement, or who had knowledge of its terms, made before the written agreement was signed, are entitled to great weight in determining what they believed the terms of the agreement were. You

may also consider the conduct of both parties after the agreement was signed and before any controversy arose. In reaching your conclusion, you should interpret any ambiguous or uncertain terms in the sense that each party reasonably believed that the other party understood the agreement to mean.

13. Instruction No. 43 provides, in pertinent part:
 Remember that I have instructed you that as a matter of law the written agreement or contract here in evidence as Exhibit 68 *is* ambiguous and you are to determine what the agreement between plaintiff Fund and defendant Nugget actually was and is from all the evidence in the case, including Exhibit 68. (emphasis in original).

As the starting point for analysis of a prevailing party's application for fees, the Court ordinarily must multiply the number of hours reasonably spent on the case by a reasonable hourly rate, to reach the so-called "lodestar" amount. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564–66, 106 S.Ct. 3088, 3097–98, 92 L.Ed.2d 439 (1986); *Patton v. County of Kings*, 857 F.2d 1379, 1382 (9th Cir.1988); *Southerland v. International Longshoremen's and Warehousement's Union, Local 8*, 845 F.2d 796, 800–801 (9th Cir.1988); *Miller v. Los Angeles County Board of Education*, 827 F.2d 617, 621 (9th Cir.1987). A strong presumption exists that the lodestar is a reasonable fee. *Patton, supra*, 857 F.2d at 1382; *Miller*, 827 F.2d at 621. The burden falls on the applicant for fees to show by satisfactory evidence "that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation." *Jordan v. Multnomah County*, 815 F.2d 1258, 1263 (9th Cir.1987).

Then, the Court may adjust the lodestar based on its consideration of twelve factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th Cir. 1974), adopted by this circuit in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir.1975).[14] Thus, the *Johnson/Kerr* factors are utilized not in the Court's calculation of the lodestar amount, but as means to justify an award greater or lesser than the presumptively reasonable lodestar. *Miller*, 827 F.2d at 621 (district court erred in calculation of attorney's fees when it was unclear if the court had calculated a lodestar figure prior to application of *Johnson/Kerr* factors). Hence, contrary to prior case law requiring application of at least some of the *Johnson/Kerr* factors, *e.g.*, *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 838–39 (9th Cir.1982), the correct approach under *Patton, Miller* and *Jordan* is to focus on the appropriate lodestar, and to apply the *Johnson/Kerr* factors only where necessary to depart from the lodestar.

With this framework in mind, the Court looks first to evidence submitted by the Fund toward calculation of the lodestar. The Fund submits in support of its application for fees, copies of bills and time records from the four law firms which it retained during the course of the litigation for work performed on the contract claim against Nugget and issues in the case common to that claim. Attorneys from each firm have submitted declarations describing the firms' respective billing procedures. The declarations list the background and education of the principal attorneys in the case. Also submitted are summaries of work performed and fees incurred by each firm, including listings of billing rates, hours expended and total amount billed for each attorney, again, purportedly limited to the contract claim and common issues.

In addition, the Fund filed a declaration of Joseph A. Ball, Esq., of Ball, Hunt, Hart, Brown and Baerwitz, a distinguished Los Angeles trial attorney. Mr. Ball is a Fellow of the American College of Trial Lawyers and has served as President of the State Bar of California and Chairman of the National Conference of Bar Presidents. In his declaration he details his familiarity with the case and concludes that the fees and expenses charged the Fund were reasonable in light of the dollar amounts in controversy, the importance of the issues raised and the results achieved. Mr. Ball declares that the rates charged were reasonable as within the range of rates charged by comparable law firms in Los Angeles for similar work. He also states that that the number of attorneys employed by the Fund was reasonable and

---

**14.** The twelve *Johnson/Kerr* factors are:
(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.
*Kerr*, 526 F.2d at 70.

efficiently used. Finally, he asserts that the time expended in discovery, trial and "the vast majority" of time expended in law and motion practice and pretrial proceedings were directed or applicable to the Fund's breach of contract claim against Nugget and that the fees for such time are, therefore, recoverable.

It is undisputable that this was an exhaustive and meticulously litigated controversy on all sides, culminating in a 10–week jury trial. The intensity of the litigation defies description, but resulted in the Court's referral of discovery and pre-trial matters to a Special Master who, over the eighteen months he was on the case, working regularly, issued some fifty orders. The parties took 45 depositions in four states, produced voluminous documents and battled vigorously over many discovery motions. They filed motions to dismiss, for summary judgment and to disqualify the Special Master. Many issues were relitigated before the Court, some several times, after determination by the Special Master.

The Court's determination of the lodestar in this case is complicated by the fact that more than 40 attorneys performed work for the Fund during the pendency of the case, although six attorneys incurred the majority of hours. Moreover, billing rates varied widely among the attorneys, depending upon their relative experience and stature, and rates changed for several of the attorneys during the course of the litigation. Accordingly, the Court is simply unable to choose a reasonable hourly rate and multiply it by the number of hours reasonably expended to reach the lodestar.

Instead, the proper and most efficacious procedure appears to be to first find, after consideration of all the materials submitted by the Fund, that the hourly rates charged were reasonable. Golden Nugget makes no objection to the rates charged. The Fund should then be awarded fees incurred at such rates for all relevant work, the hours expended for such work being reasonable.

Paramount here is the well-settled maxim that:

> [w]here a cause of action based on the contract providing for attorney's fees is joined with other causes of action beyond the contract, the prevailing party may recover attorney's fees under section 1717 only as they relate to the contract action.... A litigant may not increase his recovery of attorney's fees by joining a cause of action in which attorney's fees are not recoverable to one in which an award is proper.

*Reynolds Metals Co. v. Alperson,* 25 Cal. 3d 124, 129, 158 Cal.Rptr. 1, 3–4, 599 P.2d 83, 85–86 (1979); *Diamond v. John Martin Co.,* 753 F.2d 1465, 1467 (9th Cir.1985). Alternatively, and of great significance here, is the corollary that, "Attorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." *Reynolds, supra,* 25 Cal.3d at 129–30, 158 Cal.Rptr. at 4, 599 P.2d at 86; *Diamond, supra,* 753 F.2d at 1467.[15]

The Fund avers in its application for fees that it has submitted documentation which reflects work performed and fees incurred only on the contract claim and issues common to that claim. Nugget has designated specific work and fees incurred for which it opposes an award of fees to the Fund. Nugget separates these fees roughly into four basic categories: services unrelated to any claim against Golden Nugget, services unrelated to the contract claim, services partially related to the contract claim and services whose description in the Fund's documentation is assertedly too vague to

---

**15.** Nugget argues that a higher standard should apply; namely, that fees incurred for work on other than the contract claim is not recoverable unless "inextricably intertwined" with the contract claim. *Diamond,* 753 F.2d at 1467. While *Diamond* states this standard is the "recognized barrier," *id.,* to recovery of fees incurred for work not directly related to a contract claim, the court cites no authority for this test. Nor has it been followed by California courts or this circuit. In addition, it is not clear that it is a qualitatively different standard than the "common issue" test stated in *Reynolds, supra,* and quoted in *Diamond.* Therefore, the Court declines to apply an inexplicably intertwined standard to the Fund's request for fees for work performed outside of its contract claim.

determine whether they are related or unrelated.

■ Nugget has submitted in two sets of briefs lists of work performed by the Fund's attorneys for which it claims fees should not be awarded. With regard to services Nugget claims are entirely *unrelated to any claim* against Nugget, the Court agrees that some expenses do not comport with the common issue standard set forth in *Reynolds* and *Diamond, supra.* These unrelated and non-recoverable services are listed in Exhibit B of Nugget's opposition filed August 28, 1988, and include work performed with regard to a possible agency theory of liability; a related action against the law firm Tuttle & Taylor, which represented Palmieri during the time Palmieri negotiated and sold the Notes to Nugget; a response to a cross-complaint; preparation of an unidentified complaint; preparation of a motion *in limine* re: Palmieri's control of the Notes; research re: Palmieri's damage theory; use of a jury consultant and "focus jury;" and post-trial settlement talks with Palmieri. Fees charged for these unrelated services total $43,566 and are not recoverable by the Fund.

Nugget also lists in Exhibit A to its August 28 opposition, services it claims are *unrelated to the contract claim.* Several of the items on this list do not pertain to issues common to the contract claim and, therefore, are not recoverable. They include services related to the Fund's claims for rescission, mistake, ERISA, RICO and punitive damages. These fees total $21,053 and are not recoverable.

Nugget submits in its pleadings, including its supplemental opposition filed September 28, 1988, many other items that it claims are unrelated to the contract claim or any claim against Nugget. The Court has considered each of these items under the common issue standard, in conjunction with arguments presented in the moving and opposition papers, and finds that each is sufficiently related to the contract claim to be recoverable.

Next, Nugget submits in Exhibit C to its August 28 opposition, services it suggests are only *partially related to the contract claim.* These items include preparation of complaints, opposition to Nugget's motion for summary judgment, memorandum of contentions of fact and law, jury instructions, motions *in limine,* trial brief and Pre-trial Conference Order. In its supplemental opposition, Nugget argues that the Fund should only recover fees incurred for that percentage of work for each of these documents directly pertaining to the contract claim. For example, Nugget claims that only the fees incurred for preparation of those portions of the Fund's memorandum of contentions, Pre-trial Conference Order and trial brief, which discuss the contract claim should be recoverable under this "allocation" theory. Nugget asks the Court to assign a percentage to the portion of each document covering only the contract claim, and to limit recovery to that percentage of the total fees charged for the corresponding document. This method, although potentially applicable in other cases, is unsupported by authority, unworkable and would constitute a misapplication of the common issue standard. Accordingly, the Court declines to "allocate" fees incurred for these services and finds the total amount of fees incurred for these partially related items to be recoverable.

■ Lastly, Nugget contends in its supplemental opposition that fees for many services charged to the Fund are listed in the Fund's documentation in a manner which is *too vague for determination* of their relatedness to the contract claim. The Fund states in its supplemental reply, filed October 12, 1988, that these purportedly vague items have been partially redacted in order to protect privileged communications. Yet, even as redacted, these items, viewed with the Fund's application for fees as a whole, provide more detail than required by California law. California courts do not require contemporaneous time records be submitted in support of a motion for attorney's fees. *Martino v. Denevi,* 182 Cal.App.3d 553, 559, 227 Cal.Rptr. 354, 358 (1986). Moreover, the Ninth Circuit requires only that affidavits submitted by the party requesting fees be sufficient

to enable the court to consider all the factors necessary to determine a reasonable attorney's fee award. *Dennis v. Chang,* 611 F.2d 1302, 1308 (9th Cir.1980). Thus, the Court finds after consideration of all the relevant pleadings, including the declarations of the Fund's counsel and its expert, Mr. Ball, that the fees alleged by Nugget to be unrecoverable because of vagueness, are recoverable.

The lodestar can now be calculated, and is the total amount of fees requested—at rates determined herein to be reasonable—exclusive of the amount of fees determined not to be recoverable. The amount of non-recoverable fees under the above analysis is $64,619.00. The Fund's total request is $2,000,247.00. Therefore, the lodestar is this requested amount less $64,619.00, a resulting figure in the amount of $1,935,-628.00.

Finally, the Court does not find it appropriate that this lodestar figure be adjusted by reference to the twelve *Johnson/Kerr* factors, *supra. See, e.g., Miller v. Los Angeles County Board of Education,* 827 F.2d 617, 621 (9th Cir.1987). The parties have not requested nor does the Court find any justification for awarding fees in an amount greater or lesser than the lodestar for fees reflecting work performed which was sufficiently related to the Fund's contract claim. Nor would application of the *Johnson/Kerr* factors compel a different result than the amount of fees recoverable under the modified lodestar analysis the Court has used here.

### 3. Costs

The Fund also seeks costs in the amount of $287,081.82. Although costs are available to the prevailing party in this dispute under the October 31, 1984 contract, as provided in Paragraph 8 of the November 7, 1984 agreement, the Court declines to make such an award here. The costs available to the Fund are limited to those expenses recoverable pursuant to a proper cost bill timely filed with the Clerk of this Court. *See* Local Rule 16.

In summary, the Fund's motion for attorney's fees is granted in part; the Fund is entitled to judgment against Golden Nugget in the amount of $1,935,628.00 for recoverable attorney's fees; and costs limited to those taxed by the Clerk.

### D. *Palmieri's Motion for Attorney's Fees and Costs Against the Fund*

Defendant Palmieri seeks an award of attorney's fees in the amount of $1,754,-000.00 and $155,079.00 in costs pursuant to its judgment of no liability on the Fund's claim for breach of ERISA. Palmieri applies for fees both under an indemnity provision in its contract with Morgan Stanley and under ERISA. The Fund opposes the motion on both grounds and contests the amount of fees requested as including work not sufficiently related to the ERISA claim. Since the Court concludes that Palmieri may recover attorney's fees under ERISA, the contractual basis need not be addressed.

### 1. *Entitlement to Attorney's Fees*

ERISA provides that, "In any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In *Hummell v. S.E. Rykoff & Co.,* 634 F.2d 446 (9th Cir.1980), the Ninth Circuit set forth five factors, among others, a District Court should consider when deciding whether to award attorney's fees to a party in an ERISA case. These factors are:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

*Id.* at 453. These *Hummel* factors are relevant but not binding, and no one of the factors by itself is decisive. *Paddack v. Morris,* 783 F.2d 844, 846 (9th Cir.1986); *Carpenters Southern California Admin-*

*istrative Corp. v. Russell,* 726 F.2d 1410, 1416 (9th Cir.1984). Application of *Hummel* is proper where either plaintiffs or defendants seek fees under section 1132(g)(1). *Russell,* 726 F.2d at 1416.

 The Fund contends that Palmieri should not be awarded attorney's fees under section 1132(g)(1) because such awards against ERISA plaintiffs are disfavored, violate the policy objectives of ERISA and are awarded only in limited circumstances. *See Paddack, supra* (plaintiff brought suit in bad faith); *Operating Engineers Pension Trust v. Gilliam,* 737 F.2d 1501 (9th Cir.1984) (prosecution of suit was "grossly unfair"). This argument, though plausible, is contrary to the most recent authorities.

In *Marquardt v. North American Car Corp.,* 652 F.2d 715 (7th Cir.1981), the Seventh Circuit affirmed the District Court's denial of attorney's fees requested by an employer defendant against its former employee and spouse who brought suit for pension benefits under ERISA. The Court of Appeals found that the defendant's bad faith, the plaintiffs' inability to pay attorney's fees and analysis of other *Hummel* factors militated against granting an award of fees to the defendant employer. *Marquardt,* 652 F.2d at 718–19. In *dicta,* the court considered and concluded that application of each of the *Hummel* factors will most often defeat an award of fees requested by a defendant against an ERISA plaintiff. 652 F.2d at 719–21. Subsequently, in *Russell, supra,* the Ninth Circuit vacated and remanded an award of attorney's fees granted to a defendant employer against a plaintiff benefit plan because the trial court failed to consider the *Marquardt* case. *Russell,* 726 F.2d at 1416–17. However, in the more recent *Paddack* case, *supra,* the Ninth Circuit reconsidered and repudiated *Russell*'s strict requirement that a District Court analyze and apply the *Marquardt dicta. Paddack,* 783 F.2d at 847; *see also Gilliam,* 737 F.2d at 1506. In both *Paddack* and *Gilliam* the Ninth Circuit affirmed awards of attorney's fees in favor of employer defendants against trust fund plaintiffs in suits brought to collect unpaid contributions to the respective funds. There-

fore, the Fund's contention that there exists a policy or presumption precluding an award of attorney's fees against an ERISA plaintiff lacks merit.

 In addition, the atypical facts of this case must be considered. The instant case fits within neither of the two common types of ERISA law suits: a) employee suits against ERISA pension plans for failure to pay benefits (*e.g., Hummell, Marquardt*), or b) ERISA pension plan suits against employers for failure to make payments to the plans (*Paddack, Gilliam* and *Russell*). Here, the plaintiff ERISA Fund sued its agent and investment manager, Palmieri, for improper handling of Fund assets. The *Marquardt dicta* that defendants will seldom recover attorney's fees under *Hummel* against an ERISA plaintiff has little application here. In *Marquardt,* an employer sought fees against an individual pensioner and his wife who brought suit to recover pension benefits, a vastly different scenario than the one now before this Court.

 Analysis of the case law dictates that the Court must proceed to apply the *Hummel* factors to the facts of this case. As stated above, none of the factors is determinative and not all may be relevant.

1. *Degree of Culpability or Bad Faith of the Fund.* Contrary to the Fund's position, a successful defendant need not show "bad faith" or that the action was "frivolous, unreasonable, or without foundation," to recover fees under ERISA. *Russell,* 726 F.2d at 716; *cf. Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978) (standards for award of attorney's fees under Title VII of the Civil Rights Act). This is consistent with the rule that no one *Hummel* factor is dispositive, *supra.* Nevertheless, Palmieri argues that the Fund acted in bad faith by arbitrarily and unilaterally terminating Palmieri as manager of this litigation and by prematurely naming Palmieri as a defendant in unmeritorious claims in the Second Amended Complaint. This argument lacks force. Mor-

gan Stanley, as Named Fiduciary of the Fund, was obligated to bring any suit against Palmieri necessary to protect and conserve the Fund's assets for its beneficiaries. The Fund argues that permitting Palmieri to remain manager of the Fund's litigation against Nugget—which it had been prior to the Fund's filing of its Second Amended Complaint—would have constituted a conflict of interest for Palmieri because Palmieri's allegedly negligent actions with respect to the ambiguity of the Contract underpin this litigation. Further, had the Fund not joined Palmieri to this action, but waited until the outcome of its suit against Nugget—as Palmieri suggests the Fund should have done—would have been duplicitous, costly and risked inconsistent judgments. For these reasons, analysis of this first *Hummel* factor weighs against an award of fees to Palmieri.

2. *Ability of the Fund to Pay Palmieri's Fees.* Palmieri has requested in excess of $1.9 million in attorney's fees and costs. Testimony adduced at trial included the Fund's ownership of assets in the amount of $8 billion. Thus, the Fund's ability to pay the amount of fees requested by Palmieri is clear and weighs in favor of such an award.

3. *Whether an Award of Fees Will Have a Deterrent Effect on Similar Conduct by the Plaintiff.* The rationale for analysis of this factor is well-founded in common sense—awards of attorney's fees against parties filing frivolous law suits will presumably deter future meritless suits. The Fund's suit against Palmieri for violation of its fiduciary duties under ERISA was not frivolous. The issue of whether Palmieri violated ERISA by either signing an ambiguous contract for sale of the Notes or by failing to retain a sufficient security interest in the Notes was a close, vigorously contested one, ultimately resolved by the jury. Like the first *Hummel* factor, the Court finds no bad faith on the part of the Fund and, accordingly, no need to deter future law suits of this nature. Hence, this factor does not weigh in favor of an award of fees.

4. *Whether Palmieri Sought to Benefit ERISA Plan Beneficiaries or Resolve a Significant Legal Question Involving ERISA.* Throughout the course of Palmieri's involvement as a defendant in this case, it has maintained the position that the Contract provided for the Nugget's sharing with the Fund profits received as a result of prepayment of the Notes. This position and Palmieri's consistent conduct up through completion of trial provided substantial assistance to the Fund in proving that Nugget breached the Contract and was liable for damages to the Fund. Testimony of Palmieri witnesses and documents offered into evidence by Palmieri amply supported this position. In addition to providing a second, consistent voice against Nugget, Palmieri's efforts at trial complemented *and* supplemented the Fund's case on the contract claim against Nugget. Moreover, Palmieri asserted many positions that involved resolution of significant legal questions under ERISA. These included, but were not limited to, the standard of care of investment managers under ERISA, the appropriate measure of damages under ERISA, and Palmieri's liability under the circumstances of the case. Accordingly, this fourth *Hummel* factor weighs heavily in support of an award of fees to Palmieri.

5. *Relative Merits of the Parties' Positions.* Palmieri received a favorable jury verdict and judgment on the Fund's ERISA claim. Yet, as stated above, the Fund's position was not entirely unmeritorious, though ultimately unavailing. This fifth *Hummel* factor also weighs in favor of Palmieri, however slightly.

The result of application of each of the *Hummel* factors is that two factors weigh strongly in favor of an award of fees (factors 2 and 4), one factor slightly in favor (factor 5) and two factors against an award of fees (factors 1 and 3). The Court next weighs these results to determine the propriety of awarding attorney's fees in this case. The two factors that weigh against an award of fees share the common finding of the absence of bad faith on the part of the Fund. As bad faith is not a prerequisite to an award of fees, *Russell,*

*supra,* an award is proper here because of the strength of the factors which favor awarding fees. Most notably, Palmieri's efforts during discovery, pre-trial and trial must be viewed as significant in assisting the Fund to prevail on its contract claim against Golden Nugget. In summary, the Court finds that application of the *Hummel* factors requires the Court award attorney's fees to Palmieri and against the Fund on the ERISA claim.

### 2. *Amount of Fees*

In determining the amount of fees to be awarded Palmieri, the Court follows the analysis set forth above with respect to the Fund's motion for fees against Nugget. First, the Court determines the lodestar, upon consideration of evidence submitted by the parties. Then, an adjustment under *Johnson/Kerr, supra,* may be made if necessary.

Palmieri requests a total of $1,754,000 in attorney's fees incurred pursuant to work performed by its counsel, Gibson, Dunn & Crutcher. These fees represent 9,882 total hours, 6,715 of which were expended by attorneys, the balance by paralegals, law clerks, summer associates and other support personnel. The extent and intensity of legal services necessarily performed has already been described with regard to the Fund's motion for fees.

As did the Fund in support of its motion for fees, Palmieri's counsel has also submitted detailed documentation in support of its application. These materials include billing information sheets, reflecting only those fees actually charged to Palmieri, and an explanation of counsel's billing procedures. Also provided is a list of all attorneys, paralegals and other personnel who performed work on the case, their educational background, billing rates, dates of involvement and total hours incurred. Although nearly 40 attorneys performed work on this case for Palmieri at various times during its pendency, including 16 partners, more than 80% of the work was performed by a team of three. The fees and hours submitted are purportedly those pertaining only to the Fund's ERISA claim

and issues common to that claim. Palmieri has also included declarations from two prominent Los Angeles trial attorneys, William W. Vaughn, Esq., Chairman of the Litigation Department at O'Melveny & Myers, and Robert F. Lewis, Esq., of Lewis, D'Amato, Brisbois & Bisgaard. Both attorneys describe their familiarity with the case and attest to the reasonableness of the rates charged and hours expended for this case in light of the rates charged for similar work in the Los Angeles legal community, the nature of the case, the risk and complexity of the matter, importance of the case to the client and result achieved.

As with the Fund's motion for fees, determination of the lodestar cannot be made by a single calculation of hours expended multiplied by rates charged, due to the large number of attorneys involved and their different billing rates. Again, the Court need only find, and the Fund does not contend to the contrary, that the various rates charged were reasonable, and then award fees for all work sufficiently related to Palmieri's defense of the Fund's ERISA claim.

The Court is not aware of authority setting forth an ERISA standard akin to the "common issue" test with regard to contract claims under California law, *Reynolds Metals Co. v. Alperson,* 25 Cal.3d 124, 129, 158 Cal.Rptr. 1, 599 P.2d 83 (1979); *Diamond v. John Martin Co.,* 753 F.2d 1465, 1467 (9th Cir.1985), discussed with regard to the Fund's motion for fees against Nugget. It is unnecessary to delineate a precise rubric here. The Fund objects to services performed in two areas—work related to a) the availability of insurance coverage to Palmieri and b) Palmieri's cross-claim against Nugget. The Court agrees that both areas of work are sufficiently unrelated to the ERISA claim under any reasonable standard so as to bar their inclusion in the present award of fees to Palmieri. The parties filed a stipulation on September 29, 1988 that the attorney's fees attributable to these areas are in the amount of $30,000. Hence, the lodestar for Palmieri's fees should be the requested amount of $1,754,000 reduced by $30,000,

rendering the amount recoverable to be $1,724,000. The lodestar should not be adjusted according to the *Johnson/Kerr* factors for the reasons set out earlier with respect to the Fund's motion for fees, *supra*.

### 3. Costs

As the Court has stated with regard to the Fund's motion for fees and costs, Palmieri is not entitled to costs pursuant to this motion. The costs recoverable under section 1132(g)(1) of ERISA are coextensive with the costs which may be recovered under a proper Local Rule 16 cost bill filed with the Clerk.

In conclusion, Palmieri's motion for attorney's fees is granted in part; Palmieri is entitled to judgment against the Fund in the amount of $1,724,000 for attorney's fees; and costs limited to those taxed by the Clerk.

### CONCLUSION

After argument, and the Court having fully analyzed and considered all of the papers and pleadings filed herein, the aforesaid motions are decided as hereinabove set forth, and judgments shall be rendered accordingly.

This Opinion shall constitute Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52.

The Clerk shall file, enter, and serve this Opinion and Order Re: Post–Trial Motions and Amended and Supplemental Judgments upon all parties and attorneys of record herein.

SO ORDERED.